<u>John W. Green, III v. State of Maryland</u>, No. 4, September Term, 2017

**MANDATORY DISCLOSURES DURING DISCOVERY – PRETRIAL IDENTIFICATION OF A CO-DEFENDANT – MARYLAND RULE 4-263(d)(7)(B)** – Court of Appeals held that, as a general matter, Maryland Rule 4-263(d)(7)(B)—which requires State to disclose to defense during discovery, without necessity of request, "[a]ll relevant material or information regarding . . . pretrial identification of the defendant by a State's witness"—does not, by its plain language or history, require State to disclose pretrial identification of co-defendant. Court concluded, however, that pretrial identification of co-defendant is "relevant . . . information regarding . . . pretrial identification of the defendant" under Maryland Rule 4-263(d)(7)(B) where pretrial identification of co-defendant is equivalent of pretrial identification of defendant as person responsible for crime. Here, eyewitness's pretrial identification of co-defendant as person who was not shooter was equivalent of pretrial identification of defendant as shooter, as State's theory was, and its evidence showed, that defendant, co-defendant, and person killed were only people at scene of shooting, and person killed was shot by one of the two other people present.

Circuit Court for Cecil County
Case No. 07-K-13-001914

Argued: September 7, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 4

September Term, 2017

_____

JOHN W. GREEN, III

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Opinion by Watts, J.
Barbera, C.J., McDonald and Hotten, JJ.,
dissent.

_____

Filed: October 20, 2017

"Whether a witness can positively identify the [defendant] at the scene of the crime is often the cardinal facet of a determination of guilt." Williams v. State, 364 Md. 160, 179, 771 A.2d 1082, 1093 (2001). In other words, "[i]dentification testimony may be outcome determinative[.]" Id. at 174, 771 A.2d at 1090. "[H]ence, any solid preparation of a defense demands this information." Id. at 174, 771 A.2d at 1090.

During discovery in a criminal case in a circuit court, Maryland Rule 4-263(d)(7)(B) requires the State to disclose to the defense, without the necessity of a request, "[a]ll relevant material or information regarding . . . pretrial identification of the defendant by a State's witness[.]"

Here, we are asked to decide whether Maryland Rule 4-263(d)(7)(B) requires the State to disclose to a defendant's counsel information regarding a State's witness's pretrial identification of a co-defendant. If not, we must decide whether Maryland Rule 4-263(d)(7)(B) required the State to make such a disclosure under the circumstances of this case, in which the State's undisputed theory was that only the defendant and co-defendant were with the person who was killed when he was fatally shot, and a State's witness identified the co-defendant as not being the shooter.

At trial, the State, Respondent, offered evidence of the following theory of the case. John W. Green, III ("Green"), Petitioner, was friends with Jonathan Copeland ("Copeland"), a drug dealer. One of Copeland's customers was Jeffrey Myers ("Myers"), the person who was killed. One day, Myers burglarized Copeland's residence and stole cash and drugs. Later that day, Copeland and Green went to Myers's residence and confronted him about the burglary. The next day, Copeland obtained a handgun. The

following day, Copeland and Green returned to Myers's residence and confronted him about the burglary again. During the confrontation, Myers was fatally shot. Copeland, Myers, and Green were the only people who were present at the time of the shooting. According to the State, Green was the shooter.

Green was the only defendant when the case proceeded to trial. Copeland had been charged with the same offenses with respect to Myers. Copeland, however, pled guilty to first-degree murder and conspiracy to commit first-degree murder.

The State's sole eyewitness to the shooting was Doris Carter ("Carter"). Carter saw two men with Myers at the scene of the shooting. Carter was unable to see the shooter's face because he was wearing a hoodie. Carter, however, saw the face of the person who was not the shooter.

At trial in the Circuit Court for Cecil County ("the circuit court"), during Carter's direct-examination, the prosecutor proffered that Carter would identify Copeland as the person who was not the shooter. Green's counsel objected on the ground that the State had not disclosed Carter's identification of Copeland during discovery. The circuit court permitted Carter to identify Copeland. Copeland was briefly brought into the courtroom, and Carter identified him as the person who did not do the shooting.

Before us, Green contends that the circuit court erred in permitting Carter to identify Copeland for two alternative reasons. First, Green argues that Maryland Rule 4-263(d)(7)(B) requires the State, as a matter of course, to disclose a pretrial identification of a co-defendant during discovery. Second, Green asserts that Maryland Rule 4-263(d)(7)(B) required such a disclosure in this case because a pretrial identification of

- 2 -

Copeland as the person who was not the shooter essentially constituted a pretrial identification of Green as the shooter.

In Part I, we hold that, as a general matter, Maryland Rule 4-263(d)(7)(B), by its plain language and history, does not require disclosure of pretrial identifications of co-defendants. In Part II, we conclude that a pretrial identification of a co-defendant is "relevant . . . information regarding . . . pretrial identification of the defendant" under Maryland Rule 4-263(d)(7)(B) where the pretrial identification of the co-defendant is the equivalent of a pretrial identification of the defendant as the person responsible for the crime. Here, Carter's pretrial identification of Copeland as the person who was not the shooter was the equivalent of a pretrial identification of Green as the shooter because the State's theory of the case was, and the State's evidence showed, that Green, Copeland, and Myers, the person who was killed, were the only people at the scene of the shooting, and Myers was shot by one of the other two men. Thus, the State was obligated to disclose during discovery Carter's pretrial identification of Copeland as the person who was not the shooter.

## BACKGROUND

### Charges, Writ of Habeas Corpus, and State's Opening Statement

On November 13, 2013, Green was indicted for first-degree murder, second-degree murder, conspiracy with Copeland to commit first-degree murder, use of a firearm in the commission of a felony or crime of violence, possession of a firearm after conviction of a disqualifying crime, and wearing, carrying, or transporting a handgun.

On November 18, 2014, prior to trial, the State filed a Request for Writ in the circuit

court, asking that "a writ be issued to" Copeland. (Emphasis omitted). The Request for Writ did not state its purpose. On November 28, 2014, the circuit court issued to Copeland a Writ of Habeas Corpus Ad Testificandum/Prosequendum for each day from December 9 through December 12, 2014, and each day from December 15 through December 19, 2014. On December 8, 2014, trial began.

After a jury was selected, but before opening statements, the prosecutor informed the circuit court that the State intended to call Carter as a witness. The prosecutor advised that he wanted Copeland to appear in the courtroom during Carter's testimony so that she could identify him. Green's counsel stated: "I very well might object to that. This is the first time [that] I've heard that this is going to happen."

During the State's opening statement, the prosecutor addressed Carter's identification of Copeland as follows:

> You're going to hear a witness who drove by the shooting and saw a very distinct hat and then saw the shooting actually take place in her side-view mirror.

* * *

> [Y]ou have one eyewitness putting two people, one which will be very clearly identified as [] Copeland and one that loosely identifies as [] Green, at the scene of the shooting, and that the trigger man is the one loosely identified by size, shape[,] and stature as [] Green, and you connect all the other things that you hear -- I'm not going to lay out every piece you're going to hear.

### Carter's Testimony

At trial, as a witness for the State, Carter testified that, on October 23, 2013, she was driving north on Principio Road in Cecil County. Carter saw two parked vehicles facing

each other. One vehicle was a truck, and the other was a dark Ford Mustang. Two men were nearby. One man was standing off to the side of the road. That man was shorter and stouter than the other one, and was wearing a hoodie. The other man was standing near the Mustang's driver's seat, with one foot in the Mustang and the other foot on the ground. That man was tall and thin, and was wearing a black hat with what appeared to be white snowflakes. During Carter's testimony, the State showed her a hat. Carter identified the hat as the one that she had seen on the tall, thin man. The circuit court admitted the hat into evidence.

Carter testified that she heard a gunshot. She looked into her driver's side-view mirror and saw the shorter, stouter man shoot into the truck three times. Carter could not see the face of the shorter, stouter man—*i.e.*, the shooter—because his hood was up. Carter, however, got a look at the face of the tall, thin man—*i.e.*, the person who was not the shooter—and drove away. Afterward, Carter decided to return to the scene of the shooting so that she could find out the address. Within two or three minutes, Carter drove back to the scene. On her way, she did not see the Mustang. By the time that Carter returned to the scene, the Mustang was gone.

One or two days after the shooting, Carter provided a statement to detectives in her home. Within a week, detectives interviewed Carter at a police station.

On direct-examination, the following exchange occurred with regard to Carter's ability to identify the two men:

> [PROSECUTOR: W]hen you first met with detectives, do you remember
> what you told them in terms of whether you got a good look at faces or not?

[CARTER:] You know, at first I didn't want to get anything wrong. I just wanted to say exactly what I knew that I saw. And as those memories started coming back, it was after I talked to them.

[PROSECUTOR:] So when you first met the detectives what did you say in terms of --

[CARTER:] I think I told them that I couldn't -- I could tell you how -- like one was tall and thin and the other one was short and stout, and that the one was wearing a hat. Then I think I might have said that one was a white male, but I'm not even sure.

[PROSECUTOR:] All right. As time has gone by though, as you sit -- again, as you sit here right now, do you have an image of what the taller skinnier one, as you described him, next to the driver's door looked like?

[CARTER:] Yes.

[PROSECUTOR:] And if he was presented to you do you believe that you could identify him?

[CARTER:] I think so.

While Carter was still on the stand, at a bench conference, the prosecutor stated:

> **[T]his was the reason for the writ for [] Copeland** -- noting, of course, that [Green] is not charged merely with first[-]degree murder[], he is also charged with conspiracy to commit first[-]degree murder. He's charged specifically conspiracy with [] Copeland. It is the [S]tate's proffer to the court that we believe that [] Carter, upon seeing [] Copeland, will be able to positively identify him.
>
> * * *
>
> We intend to have [] Carter specifically . . . identify [] Copeland either by face, and say, yes, that's him, or that looks like him or whatever she says, then ask her about the physique, whether that's consistent with the first or the second person or anything to that effect.

(Emphasis added) (paragraph break omitted).

Green's counsel objected, stating: "[N]owhere in any discovery has anyone told me

- 6 -

that a witness is going to identify a co-defendant[.]" Green's counsel stated: "[W]ithout giving notice, [Carter]'s going to identify [Copeland.] . . . [S]urprise, surprise, she's identifying the co-defendant." Green's counsel contended that the State had been obligated to disclose during discovery that a witness had been expected to identify Copeland.

In response, the prosecutor stated, among other things: "[C]ivilian witnesses[,] every day[,] get on the stand and say things . . . for the first time. They say things different and supplemental, additional to what they said during the interview process[.]" The prosecutor did not, however, contend that he had just learned that Carter could identify Copeland, or that he was surprised to discover that Carter could identify Copeland. The prosecutor stated that Green's counsel's

> claim of surprise that the body [of Copeland] would be produced here for purposes of the identification . . . just can't be accurate. . . . There is no surprise. This is not a surprise witness. [Green's counsel] knew that there were plenty of people that could identify [Copeland]; and[,] really[,] the only claim of surprise is, is that [Carter] is going to be able to identify [Copeland].

(Paragraph break omitted).

The prosecutor neither disputed that there had been a pretrial identification of Copeland by Carter, nor denied that Copeland had informed law enforcement officers pretrial of her ability to identify Copeland as the person who was not the shooter. Instead, the prosecutor contended that Maryland Rule 4-263(d)(7)(B) obligated the State to disclose during discovery pretrial identifications of a defendant, not a co-defendant. The prosecutor stated that Green's counsel would be able to elicit on cross-examination that, at one point, Carter "went so far as to say that she couldn't identify anybody."

Without expressly determining whether there had been a discovery violation, the

circuit court stated that it would allow Carter to identify Copeland. Copeland was brought in the courtroom, briefly stood there, and was excused. Carter identified Copeland as the tall, thin man who had been wearing a hat and standing near the Mustang's driver's side. In other words, Carter identified Copeland as the person who did not perform the shooting.

On cross-examination, the following exchanges occurred with regard to the statement that Carter had provided to detectives in her home one or two days after the shooting:

> [GREEN'S COUNSEL:] Do you remember what you told [the detectives] the first time?
>
> [CARTER:] Pretty much what I said here except for I'm sure -- like I said, it's been a year, and after that[,] I just didn't contact them to tell them anything else.
>
> * * *
>
> [GREEN'S COUNSEL:] Is it fair to say [that] the detectives asked you if you could identify [the shooter]?
>
> [CARTER:] I'm sure [that] they did. That was -- believe me, I was so nervous after all this. I was traumatized. I have to say [that] I was traumatized because I didn't sleep. I just kept thinking about it over and over again. I couldn't believe that I saw what I saw.
>
> [GREEN'S COUNSEL:] But two days later[,] they asked if you could identify either of these people.
>
> [CARTER:] Yeah. I'm sure they asked me if I knew what they were wearing, and I said the hat and the height and as much of a description --
>
> [GREEN'S COUNSEL:] Did you give them an idea -- two days after the interview you said short and stocky; or did you give an idea of height or just a general description?
>
> [CARTER:] Just that, short and stocky.

- 8 -

On cross-examination, the following exchanges occurred regarding the detectives' interview of Carter at the police station within a week after she provided the statement to detectives in her home:

[GREEN'S COUNSEL:] Is it fair to say [that,] in that interview[,] you told the detectives that you didn't really get a very good look at these people as you drove by because you were worried about their vehicle in the road?

[CARTER:] Right.

* * *

[GREEN'S COUNSEL:] And they asked you once again for descriptions of these people beyond what you've testified to, and you were unable, even a week after this happened, to give any further description, is that fair?

[CARTER:] That's fair.

[GREEN'S COUNSEL:] Have you seen a tape of your interview?

[CARTER:] Yes.

[GREEN'S COUNSEL:] So me asking you that, you've seen it?

[CARTER:] I've seen it.

[GREEN'S COUNSEL:] You know what's on there.

[CARTER:] Right. I do know what's on there. It's just that memories start coming back after I talked to them, and I didn't talk to them until now. I'm just telling you what I saw that day and what I remember [that] I saw that day.

The following exchange occurred pertaining to Carter's ability to identify Copeland:

[GREEN'S COUNSEL: Y]ou just identified the person who came in. Have you ever been shown a photo of him before?

[CARTER:] Just[,] I identified him through just like his eyes and the hat, and not because of, you know, what he was wearing today or anything like that. I remember [that] he looked at me and I looked at him as I was going by

- 9 -

because he was right there.

[GREEN'S COUNSEL:] Have you seen his picture in the newspaper or anywhere since this happened?

[CARTER:] Yes, yes, in the Cecil Daily.

[GREEN'S COUNSEL:] Oh.

[CARTER:] But I knew [that] when saw [sic] that, that was the person driving the car -- or standing outside that driver's door. The other person I'd saw in the paper also, and I didn't know them at all.

[GREEN'S COUNSEL:] When you -- since -- when was the first time that you realized, seeing a picture, that you knew who that person was?

[CARTER:] When I saw it probably in the paper. I said, oh, wow, that's the guy [who] was wearing the hat, that's the guy [who] was standing outside the door.

[GREEN'S COUNSEL:] So like a year ago?

[CARTER:] Yes, probably a little -- no, I don't know if it was a year ago because it wasn't in the paper -- I'm not sure. I'm not sure when they put it in the paper.

[GREEN'S COUNSEL:] But sometime after this case and people were charged --

[CARTER:] Yes.

[GREEN'S COUNSEL:] (Continuing) -- you saw a picture of [] Copeland, and you --

[CARTER:] And I knew that --

[GREEN'S COUNSEL:] And you knew [that] it was him?

[CARTER:] But I didn't plan on like being here today. I didn't want to be here today.

[GREEN'S COUNSEL:] Did you ever call anyone, inform anyone that --

[CARTER:] No.

[GREEN'S COUNSEL:] Okay. When did you eventually tell any of the detectives that you knew who [] Copeland was?

[CARTER:] When I went over -- over everything again with them, what I saw -- everything that I saw that day.

**Testimony of Other State's Witnesses**

Including Carter, the State called thirty witnesses. For brevity's sake, we will refrain from discussing the testimony of all of the State's witnesses and summarize the testimony of those witnesses who provided relevant information concerning Myers, Copeland, and Green, and evidence of the crime.

Randy Smith ("Smith") testified that, in October 2013, Copeland was renting a house from him. On October 21, 2013, Copeland told Smith that Myers had broken into his house and stolen cash. According to Smith, Copeland seemed "very upset."

David Gordon ("Gordon") testified that, on October 21, 2013, he was spending time with Copeland. Copeland got a telephone call about an alarm in his residence going off. Gordon and Copeland went to Copeland's residence, and Copeland went inside. Afterward, Copeland came back outside looking mad, and said that "stuff" had been stolen. Gordon and Copeland went to Myers's residence, and went inside. Copeland told Myers that cash and drugs were missing. Gordon and Copeland left Myers's residence, then picked up Green. Gordon, Copeland, and Green went to Myers's residence. Either Copeland or Green told Myers: "[J]ust give it back." Copeland also talked to Myers's father, Howard Steve Myers. Eventually, Gordon, Copeland, and Green left Myers's residence.

- 11 -

Dawn Watson ("Watson"), Myers's girlfriend, testified that, in October 2013, she lived with Myers in his parents' basement. At the time, Myers was using heroin. According to Watson, Copeland was Myers's heroin dealer. Watson testified that, on October 21, 2013, she and Myers were at home. Suddenly, the back door opened, and Copeland and another man appeared. Copeland told Myers that someone had broken into his residence. Copeland and the other man left Myers's residence. According to Watson, Copeland texted Myers, stating: "If my stuff is not in the back of your truck when I get there[,] somebody is going to get shot." Approximately half-an-hour after Copeland and the other man left Myers's residence, Copeland, Green, and the other man came to Myers's residence in Copeland's black Mustang. Watson knew Green because Myers had previously introduced him to her. At the time, Green had a full beard. Myers and his father went outside. Copeland spoke in a loud voice, but Watson could not make out what he was saying. The next day, on October 22, 2013, Green telephoned or texted Myers, warning him that people were looking for him.

Myers's mother, Rebecca Myers, testified that, on October 21, 2013, when she came home from work, she saw Copeland's black Mustang parked near her residence. Myers, his father, Copeland, Green, and another man were standing outside. Copeland accused Myers of burglarizing his residence. Myers threw his hands in the air and said: "I wasn't there. I didn't do anything." Myers's father told Copeland to get off their property. Copeland, Green, and the other man left in Copeland's Mustang.

Myers's father testified that, in October 2013, he, Myers's mother, Myers, and Watson lived on Principio Road in Port Deposit. On October 21, 2013, at approximately

3:15 p.m. or 3:30 p.m., Myers's father arrived home from work, and entered his residence. Afterward, Myers's father heard a vehicle approaching. Myers's father looked outside and saw Copeland, Green, and another man in Copeland's black Mustang. At the time, Green had a bushy beard. Myers's father went outside and asked if he could help the men. The three men asked to talk to Myers. Myers's father went inside and told Myers that he had company, and Myers went outside. Myers's father heard yelling, went outside, and asked the three men what was going on. Copeland said something along the lines of: "[N]one of [your] business[.]" Myers's father heard Copeland tell Myers that someone had broken into his residence. At approximately 4:30 p.m. or 4:35 p.m., Myers's mother arrived home. Two or three times, Myers's father told the three men to leave, or he would call the police. Eventually, the three men left.

Myers's father testified that, two days later, on October 23, 2013, at approximately 3:15 p.m. or 3:30 p.m., he came home from work. Myers was in the basement. At approximately 4:30 p.m., Myers's mother came home from work. Afterward, Myers's father heard a door slam. Later, Thomas Miller ("Miller"), a neighbor, telephoned Myers's father and said that something had happened to Myers. Myers's parents went outside. Myers's truck was at the end of the driveway, and Myers's body was in the driver's seat.

Michael Owens ("Owens") testified that, in October 2013, Copeland was his heroin dealer. At the time, Owens used one or two "bundles" of heroin each day. In September and October 2013, Owens owned approximately eight guns. One of Owens's guns was a 40 caliber Kahr handgun. Sometime before October 21, 2013, Copeland said that he wanted the handgun, and offered to either buy it or trade drugs for it. On October 21, 2013,

Copeland told Owens that someone had broken into his residence.  Copeland said that he wanted to obtain the handgun for self-defense in case another break-in occurred.

Owens testified that, the next day, on October 22, 2013, Owens went to Copeland's residence and saw Copeland, Green, and Kenny Howell ("Howell"), Copeland's cousin.  Copeland and Green "seemed to be very good friends."  Owens gave Copeland the handgun, which was loaded with six bullets.  In exchange, Copeland gave Owens thirteen bags of heroin.

Owens testified that, in March 2014, Detective Chris Lewis contacted him.  Owens gave Detective Lewis two spent shell casings that had been ejected from the handgun when he had fired it twice sometime in 2013.  During Owens's testimony, the circuit court admitted the shell casings into evidence.

Jessie Campbell ("Campbell"), a forensic scientist of the Firearms and Tool Marks Unit of the Forensic Sciences Division of the Maryland State Police, was accepted as an expert in firearm and tool mark examination.  Campbell compared the shell casings that Owens had given Detective Lewis to four shell casings that had been found at the scene of the shooting.  Campbell concluded that all six shell casings had been fired from the same gun.

Richard Bell, Jr. ("Bell") testified that, on October 23, 2013, he telephoned Copeland to ask to buy marijuana.  At approximately 4 p.m., Copeland and Howell, his cousin, came to Bell's residence in Copeland's black Mustang.  Copeland and Howell stayed at Bell's residence for approximately ten minutes.  Copeland told Bell that Myers had broken into his residence two days earlier.  Copeland "looked pretty mad," and had

- 14 -

something that "looked like a gun."

Jessica Peacock ("Peacock") testified that, in October 2013, she was dating Green. On October 23, 2013, at approximately 4:30 p.m., Green met Peacock outside the residence of one of her friends. Green told Peacock: "Something bad might happen." Afterward, Green left. At approximately 6:00 p.m., Peacock returned to her residence. At approximately 6:30 p.m., Green was dropped off at Peacock's residence. Green told Peacock that someone had been shot. Green told Peacock that he had been present at the scene of the shooting, but that he did not do it.

Gwen Wisniewski ("Wisniewski") testified that, on October 23, 2013, she was driving on Principio Road, in the area of its intersection with Biggs Highway. Wisniewski saw a truck parked in a driveway. A black Mustang with two occupants was blocking the driveway. The person in the Mustang's passenger seat was moving around.

Miller—the neighbor whom Myers's father had mentioned—testified that he lived on Principio Road, approximately one or two acres away from the Myerses' residence. On October 23, 2013, at approximately 4:45 p.m., Miller saw a black Mustang blocking Myers's truck in the driveway. A man with a long, reddish beard was standing near Myers's truck. A tall man with black hair was walking around the Mustang. Miller heard loud voices, but could not make out what was being said. Miller went into his garage. One or two minutes later, Miller heard two gunshots. Miller left his garage and saw the Mustang speeding away. Miller went to Myers's truck and saw that Myers had been shot.

Deputy First Class Ross Griffin of the Cecil County Sheriff's Office testified that he lived approximately a quarter of a mile away from Myers's residence. On October 23,

2013, while Deputy First Class Griffin was at home, he heard two gunshots. After a pause, he heard two more gunshots. Approximately one or two minutes later, a black Mustang with two occupants went down Principio Road. The passenger had a larger build than the driver, and was wearing a dark coat or jacket.

James Finn ("Finn"), a paramedic with the Cecil County Department of Emergency Services, testified that, on October 23, 2013, at 4:56 p.m., he was dispatched to Principio Road. At 5:02 p.m., he arrived. There was a truck parked in the driveway. Inside the truck was an unresponsive man with a bullet wound. The man was pronounced dead on the scene.

James Locke, M.D. ("Dr. Locke"), a medical examiner of the Office of the Chief Medical Examiner, was accepted as an expert in forensic pathology. Dr. Locke testified that, on October 24, 2013, he autopsied Myers's body. The cause of death was multiple gunshot wounds. Myers had four gunshot wounds: one to his head, one to the left side of his chest, one to the right side of his chest, and one to his right hand.

Stephanie Peterson ("Peterson"), a crime scene technician of the Cecil County Sheriff's Office, testified that, on October 23, 2013, at approximately 9:20 p.m., she arrived at Principio Road. Peterson recovered one cartridge and four cartridge casings from the scene. Peterson recovered from Myers's body 132 baggies that contained suspected heroin. In the basement of Myers's residence, Peterson saw pills, suspected marijuana seeds, suspected drug paraphernalia, and a "Suboxone strip," which is used to treat drug addiction.

Deputy First Class Jonathan Pruett of the Cecil County Sheriff's Office testified that, on October 23, 2013, he assisted in Copeland's arrest at an M&T Bank in Colora,

Maryland. A person named Eddie Haskins ("Haskins") was the only person who was with Copeland at the time of his arrest. Deputy First Class Pruett performed a search incident to arrest, and found two bundles, or approximately twenty-six bags, of heroin, as well as a cell phone on Copeland's person.

Detective William Sewell of the Criminal Investigation Division of the Cecil County Sheriff's Office testified that he obtained records for Copeland's and Green's cell phones. Detective Sewell had those records sent to Detective Jordan Swonger of the Prince George's County Police Department.

Detective Swonger was accepted as an expert in the fields of cell phones and cell phone technology. Detective Swonger testified that he had performed an analysis of the records for Copeland's and Green's cell phones. Detective Swonger prepared a Cellular Analysis Report for Copeland's cell phone, and another Cellular Analysis Report for Green's cell phone. Detective Swonger also created a map showing the cell towers to which Copeland's and Green's cell phones connected between 4:46 p.m. and 5:46 p.m. on October 23, 2013. The circuit court admitted the Cellular Analysis Reports and the maps into evidence.

On October 23, 2013, at 4:46 p.m., Copeland's cell phone connected to a cell tower in the general vicinity of Myers's residence. At 4:57 p.m., Green's cell phone connected to a different cell tower in the general vicinity of Myers's residence. Copeland's and Green's cell phones appeared to move east across Interstate 95, which runs through Cecil County and Delaware. At 5:34 p.m., Green's cell phone connected to a cell tower in the general vicinity of a Pathmark store in Delaware. At 5:39 p.m., Copeland's cell phone

connected to a different cell tower in the general vicinity of the Pathmark store in Delaware.

Detective Matt Blailock of the Criminal Investigation Division of the Cecil County Sheriff's Office testified that he reviewed surveillance videos as part of the homicide investigation. At the time, Copeland's Mustang was in the Sheriff's Office's possession. Detective Blailock was able to identify Copeland's Mustang in surveillance videos because it had after-market rims or wheels, blinkers on the side-view mirrors, and a stripe on the side. Additionally, stickers and an E-ZPass transmitter tag[1] were attached to Copeland's Mustang's windows. According to Detective Blailock, surveillance videos showed that, on October 23, 2013, sometime after 4 p.m., Copeland's Mustang traveled on Theodore Road, then turned onto Camp Meeting Ground Road. At 4:55 p.m., Copeland's Mustang traveled through the parking lot of a Landhope Farms gas station, and left onto Maryland Route 276. At 5:14 p.m., Copeland's Mustang went east through the toll booth on Interstate 95 that is near the Maryland-Delaware border. Detective Blailock viewed a surveillance video from a camera outside a Pathmark store in Delaware. On October 23, 2013, at 5:46 p.m., Copeland and Green were walking together outside of the store.

Detective Blailock testified that he helped execute a search warrant for Green's residence. Detective Blailock found a hat on the kitchen countertop. Detective Blailock was shown the hat that had been admitted into evidence—*i.e.*, the hat that Carter testified

---

[1]E-ZPass "is a commercial service that allows motorists to pay into an account from which certain roadway and bridge tolls are deducted when the motorist passes through the prescribed toll lanes equipped to receive the transmission sent from the motorist's E-Z[]Pass transmitter 'tag'." Koshko v. Haining, 398 Md. 404, 409 n.2, 921 A.2d 171, 174 n.2 (2007).

that she had seen the tall, thin man wearing. Detective Blailock identified the hat as the one that he had seized from Green's residence.

Julie Kempton ("Kempton"), a forensic scientist of the Biology Unit of the Forensic Sciences Division of the Maryland State Police,[2] testified that she had received a hat and oral swabs from Green and Copeland. Kempton found skin cells on the hat. There were two contributors to the DNA in the skin cells—one major, and one minor. The major contributor's profile matched Green's profile. Kempton excluded Copeland as the minor contributor.

Detective Lewis of the Criminal Investigation Division of the Cecil County Sheriff's Office testified that, on October 24 or 25, 2013, he and Detective Sewell interviewed Carter at her residence. On October 25, 2013, Detective Lewis prepared a statement of charges against Green. According to the statement of charges, Carter said that the shooter was a short, stocky person who was wearing a hat with snowflakes.

Detective Lewis testified that, when they were arrested and booked, Green was approximately 5'7" and 190 pounds, and Copeland was approximately 5'11" and 160 pounds. On October 25, 2013, Detective Lewis interviewed Green. Detective Lewis advised Green of his Miranda rights,[3] which he waived. Green told Detective Lewis that

---

[2]Kempton testified about her education, experience, and training in forensics. The State, however, did not offer Kempton as an expert in any field. Green's counsel did not raise any objection during Kempton's testimony.

[3]In Thomas v. State, 429 Md. 246, 249 n.1, 55 A.3d 680, 682 n.1 (2012), this Court explained that, under Miranda v. Arizona, 384 U.S. 436, 467-69 (1966),

he had never been with Copeland on October 23, 2013. Green acknowledged, however, that he and Copeland were close. Green also said that he used to have a bushy beard, and that he had shaved on the day of the interview.

**Motion for Judgment of Acquittal and Green's Testimony**

At the conclusion of the State's case, Green's counsel made a motion for judgment of acquittal, which the circuit court granted only as to the charge for possession of a firearm after conviction of a disqualifying crime.

As the only witness on his own behalf, Green testified that he had known Myers for fifteen years. According to Green, he and Myers "were all right" and "got high together." On October 22, 2013, Green telephoned Myers and told him "to watch out, that people were looking for him[.]" Green told Myers that, if he had stolen cash or drugs, he should give them back.

Green testified that on October 23, 2013, Copeland telephoned him and said that he was going to pick him up and drive to Myers's residence. Copeland said that he wanted to talk to Myers about "taking [his] s[***]." Copeland picked up Green in his Mustang. Green acknowledged that, at the time, he was wearing the hat that had been admitted into evidence.

According to Green, Copeland drove to Myers's driveway and parked in front of his

---

[law enforcement officers] are required, prior to any custodial interrogation, to inform a suspect that he or she has a right to remain silent, that any statement he or she does make can be used as evidence against him or her, and that he or she has the right to the presence of an attorney, either retained or appointed.

truck. Myers told Copeland and Green to leave, and threatened to call the police. Myers and Copeland started arguing about the "dope" that had gone missing. Myers told Copeland to move his Mustang because Myers's truck was blocked in. Green testified that while Myers was in his truck, Copeland pulled out a gun and shot Myers. Green acknowledged that no one else was present at the time.

According to Green, Copeland drove his Mustang to Delaware, with Green as a passenger. Eventually, Copeland drove to an open-air drug market, and left his Mustang to buy drugs. When Copeland left his Mustang, he had his gun, but when he returned, the gun was gone. Copeland drove down Interstate 95. Eventually, due to car trouble, Copeland parked and telephoned Haskins to ask for help. Haskins picked up Copeland and Green.

On cross-examination, Green acknowledged that, when detectives interviewed him, he falsely stated that, on October 23, 2013, he was not at the scene of the shooting. Green admitted that he told detectives that he does not drive. Green also acknowledged that he had a beard at the time of the shooting.

### State's Closing Argument

During the State's closing argument, the prosecutor addressed Carter's identification of Copeland as follows:

> Passers[]by and neighbors saw the two people outside the Mustang. One taller. One skinnier. I'm sorry. One taller and skinnier and the other was shorter and stockier. And [] Miller, the neighbor, and [] Carter, the passer[]by, both said without reservation, no ambiguity, no cross[-]examination that got them tongue[-]tied or twisted or slightly confused, no question in their minds that the shorter[,] stocky guy was the one at the side of [Myers]'s truck. [] Miller distinctly remembered a bushy beard on the

shorter[,] stockier man. And [] Copeland [was] positively identified by [] Carter, you saw him, he stood right here, she sat right there, he left the room, she said [that] that was the guy. Not just the guy. That was the guy standing at the side of the Mustang. That is one key piece of evidence. So [] Copeland was positively identified by [] Carter as being the man next to his Mustang at the time of the shooting. He is distinctly -- you have seen them both. He is distinctly the taller[,] skinnier guy as compared to [] Green. [] Green himself says [that] he doesn't drive, yet he wants you to believe that he, not Copeland, was the person at the driver's side of the door when [] Carter drove by. You know [that] that makes no sense. He was the passenger. He said, "I don't drive." You heard that in a statement to the detectives during their interview and you heard that in his testimony here. He doesn't drive. But for convenience sake [sic] of this story he concocted, he wants you to believe that roles were reversed, he got out of the car and just meandered over to the driver's side while [] Copeland was the one who went and executed [] Myers.

Still talking about that puzzle piece about short and stocky, [] Carter was quite clear in her memory. First of all, the tall[,] skinny guy was at the side of the Mustang. She said that without reservation. Secondly, she positively identified him as the guy next to the Mustang when he was in the courtroom[,] and she said that the shorter[,] stocky guy was the one by the side of the truck. This is so important. Think about the time that went by. She drove by, she's feet away, she sees Copeland standing at the side of the Mustang, and within seconds, not enough time for them to just do a quick role reversal, she hears the bang, she looks in the mirror and she sees the shorter[,] stocky guy. This tall[/]skinny versus short[/]stocky is critical. The timing did not allow the two to change positions as [] Carter heard shots fired almost instantly she passed by. So not only did she say without reservation that the shorter[,] stockier guy was the shooter, but given that she is certain that [] Copeland was the person standing at the driver's side of the Mustang[,] and given the lack of time between passing by and hearing that first shot, those two could not have swapped positions. She said she saw the shorter[,] stockier guy firing the gun.

\* \* \*

[] Wisniewski and [] Carter happened to drive by as this thing was all just going down. Think about the timeframe here, ladies and gentlemen. Think about this. They have got two guys there. Carter definitively, definitively, she is as neutral as you can get, she's a passer[]by who you could tell, maybe not as much as [] Peacock, but you could tell she didn't want to be here either. I mean, who would want to be here and testifying in circumstances like this? But she gets on the stand[,] and she says without

- 22 -

reservation, that man, [] Copeland, was the man standing at the side. This is all important because of the amount of time, the speed by which this happened.

* * *

Green, by his own admission[,] and as supported by other evidence, was, in fact, at the crime scene. The shooter was the short[,] stocky guy and had a bushy beard. [] Green was and is the shorter[,] stockier guy[,] and had, by his own admission[,] and again as supported by the evidence we presented, a bushy beard when [] Myers was shot. [] Copeland was positively identified as the man standing on the roadway immediately next to the driver's door of his own Mustang a mere second or two before the first shots were fired. [] Carter was quite clear about this fact, and [] Copeland, therefore, was not the shooter.

**Verdicts and Opinion of the Court of Special Appeals**

The jury found Green guilty of first-degree murder, conspiracy with Copeland to commit first-degree murder, use of a firearm in the commission of a felony or crime of violence, and wearing, carrying, or transporting a handgun. Green noted an appeal.

The Court of Special Appeals affirmed the convictions. See Green v. State, 231 Md. App. 53, 56, 149 A.3d 1159, 1161 (2016). The Court of Special Appeals held "that the State's discovery obligations pursuant to [Maryland] Rule 4-263(d)(7)[(B)] are limited to that set forth by the plain language of the rule, i.e., information regarding 'pretrial identification of the defendant by a State's witness.'" Id. at 74, 149 A.3d at 1171. In other words, the Court concluded that Maryland Rule 4-263(d)(7)(B) is unambiguous, and applies only to "disclosure of pretrial identifications of 'the defendant.'" Id. at 72, 149 A.3d at 1170. The Court observed that, in contrast to Maryland Rule 4-263(d)(7)(B), other provisions of Maryland Rule 4-263(d) expressly use the term "co-defendant." See id. at 72, 149 A.3d at 1170.

- 23 -

The Court concluded that Green had supplied "no persuasive authority" indicating that Maryland Rule 4-263(d)(7)(B) applies to a pretrial "identification of someone other than the defendant" where such a pretrial identification "suggests, in conjunction with other evidence, that the defendant was involved with the crime." Id. at 73, 149 A.3d at 1171. The Court reasoned that concluding otherwise would make the State's discovery obligations depend on the defendant's trial strategy, "which often will be unknown prior to trial." Id. at 74, 149 A.3d at 1171. Applying its holding to the facts of this case, the Court concluded that the State did not violate Maryland Rule 4-263(d)(7)(B) by not disclosing during discovery Carter's pretrial identification of Copeland. See id. at 74, 149 A.3d at 1171.

**Petition for a Writ of *Certiorari***

Green petitioned for a writ of *certiorari*, raising the following two issues:

> 1. Does Maryland Rule 4-263(d)(7)(B), which requires the State to disclose "[a]ll relevant material or information regarding . . . pretrial identification of the defendant by a State's witness," require the State to disclose all relevant material or information regarding pretrial identification of a co-defendant by a State's witness?

> 2. Where [Green] and another individual, [] Copeland, who pled guilty to first[-]degree murder and conspiracy to commit first[-]degree murder in the shooting death of the victim in [Green]'s case, were both present at the scene of the shooting, and the eyewitness identification of Copeland as the [person who was not the shooter] implicated [Green] as the person who shot and killed the victim, did the Court of Special Appeals err in holding that information regarding the identification of Copeland did not fall within the scope of "relevant material or information regarding . . . pretrial identification of the defendant by a State's witness," under [Maryland] Rule 4-263(d)(7)(B)?

(Ellipses and first alteration in original). This Court granted the petition. See Green v.

- 24 -

State, 452 Md. 4, 155 A.3d 891 (2017).

## DISCUSSION

## I. Pretrial Identification of Co-Defendants

## The Parties' Contentions

Green contends that, as a general matter, Maryland Rule 4-263(d)(7)(B) requires the State to disclose a State's witness's pretrial identification of a co-defendant. Green argues that disclosure of a pretrial identification of a co-defendant fulfills the objectives of Maryland Rule 4-263—namely, assisting the defendant in the preparation of a defense and protecting the defendant from unfair surprise. Green asserts that the Court of Special Appeals's holding resulted in too narrow an interpretation of Maryland Rule 4-263(d)(7)(B), and that the use of the phrase "all relevant material or information" in the subsection warrants a broader interpretation, requiring disclosure of a pretrial identification of a co-defendant.

Green maintains that Maryland Rule 4-263(d)(7)(B) is analogous to Maryland Rule 4-263(d)(6)(G), which requires the State to disclose a pretrial failure to identify a defendant or a co-defendant. Green acknowledges that, unlike Maryland Rule 4-263(d)(6)(G), Maryland Rule 4-263(d)(7)(B) does not explicitly refer to co-defendants. Green contends, however, that "there is no reasonable explanation as to why the [Standing Committee on Rules of Practice and Procedure ("the Rules Committee")] would recommend[—]and this Court, in its rulemaking capacity, would require[—]disclosure of information regarding the failure of a witness to identify a co-defendant[,] but not disclosure of information regarding the witness's identification of a co-defendant." According to Green, both of

these pieces of information are important to preparing a defense, and neither is more burdensome to produce than the other. Green argues that the inclusion of the term "co-defendant" in Maryland Rule 4-263(d)(6)(G) mandates the inclusion of the term "co-defendant" in Maryland Rule 4-263(d)(7)(B).

Green asserts that, even if Maryland Rule 4-263(d)(6)(G)'s use of the word "co-defendant" does not establish that Maryland Rule 4-263(d)(7)(B) applies to co-defendants, Maryland Rule 4-263(d)(6)(G)'s use of the word "co-defendant" shows that Maryland Rule 4-263(d)(7)(B) is ambiguous in its applicability to co-defendants. Green maintains that, if Maryland Rule 4-263(d)(7)(B) is ambiguous, the Rule's history is vital to resolving any question as to its construction. Green points out that Maryland Rule 4-263 was amended in 2008, and contends that the Rules Committee sought to harmonize Maryland Rule 4-263 with the American Bar Association Standards for Criminal Justice: Discovery and Trial by Jury, 3d Ed. (1996) ("the ABA Standards") as much as possible, and, as such, intended Maryland Rule 4-263(d)(7)(B) to "cover identifications of the defendant or co-defendant." (Footnote and ellipsis omitted). Green argues that the lack of inclusion of the term "co-defendant" in Maryland Rule 4-263(d)(7)(B) is not evidence of a deliberate omission.

The State responds that Maryland Rule 4-263(d)(7)(B)'s plain language limits the State's discovery obligations to pretrial identifications of the defendant, not a co-defendant. The State points out that Maryland Rule 4-263(d)(7)(B) explicitly refers to "the defendant," not "a defendant," meaning that Maryland Rule 4-263(d)(7)(B) may not be construed to include any defendant—*i.e.*, a co-defendant or a defendant. In other words, the State contends that the Rules Committee specifically chose language limiting Maryland Rule 4-

- 26 -

263(d)(7)(B) to disclosure of the pretrial identification of the defendant. The State argues that, because the Rules Committee chose to include the phrase "or a co-defendant" in other provisions of Maryland Rule 4-263, but deliberately omitted the phrase from Maryland Rule 4-263(d)(7)(B), it must be presumed that the omission is intentional.

The State acknowledges that the purposes of Maryland Rule 4-263 include assisting the defendant in the preparation of a defense and protecting the defendant from unfair surprise, but the State asserts that not all alleged surprises are covered by Maryland Rule 4-263. The State points out that another purpose of the discovery rules is the provision of clear notice as to what is required to be disclosed. The State maintains that interpreting Maryland Rule 4-263(d)(7)(B)—which refers to the disclosure of a pretrial identification of "the defendant"—to include a requirement to disclose the pretrial identification of a co-defendant would not provide adequate notice of the State's disclosure obligations.

The State contends that Maryland Rule 4-263(d)(7)(B)'s history does not show that the Rules Committee intended for the phrase "the defendant" to include co-defendants and/or co-conspirators. The State points out that ABA Standard 11-2.1 requires disclosure of "[a]ny material, documents, or information relating to lineups, showups, and picture or voice identifications in relation to the case." The State notes that, in proposing amendments to Maryland Rule 4-263, the Rules Committee considered the ABA Standards, but failed to include the broad language requiring disclosure of any pretrial identifications in relation to the case. The State argues that, instead, the Rules Committee decided to narrow the State's disclosure requirement to "[a]ll relevant material or information regarding . . . pretrial identification of the defendant by a State's witness[.]"

The State asserts that the Rules Committee was free to require the disclosure of a pretrial failure to identify a co-defendant in Maryland Rule 4-263(d)(6)(G) and not require the disclosure of a pretrial identification of a co-defendant in Maryland Rule 4-263(d)(7)(B).

The State contends that Maryland case law does not support the position that the pretrial identification of a co-defendant is required to be disclosed under Maryland Rule 4-263(d)(7)(B). The State points out that the cases relied on by Green involve pretrial identifications and non-identifications of "the defendant," not a co-defendant. The State asserts that, even if Maryland Rule 4-263(d)(7)(B) can be construed to apply to a co-defendant, it is unclear in this case that Copeland was a co-defendant because he and Green were not charged in the same charging document, did not appear at the same hearings, and were not tried together.

**Standard of Review**

Where, as here, a trial court does not expressly determine that a discovery violation occurred, an appellate court reviews the issue without deference. See Williams, 364 Md. at 169, 771 A.2d at 1087 ("Where the trial [court] made no specific finding as a matter of law that the State violated the discovery rule, we exercise independent *de novo* review to determine whether a discovery violation occurred." (Citations omitted)).

In Fuster v. State, 437 Md. 653, 664-65, 89 A.3d 1114, 1120 (2014), this Court discussed the standard for interpreting a Maryland Rule:

> A court interprets a Maryland Rule by using the same canons of construction that the court uses to interpret a statute. First, the court considers the Rule's plain language in light of: (1) the scheme to which the Rule belongs; (2) the purpose, aim, or policy of this Court in adopting the Rule; and (3) the presumption that this Court intends the Rules and this

Court's precedent to operate together as a consistent and harmonious body of law. If the Rule's plain language is unambiguous and clearly consistent with the Rule's apparent purpose, the court applies the Rule's plain language. Generally, if the Rule's plain language is ambiguous or not clearly consistent with the Rule's apparent purpose, the court searches for rulemaking intent in other indicia, including the history of the Rule or other relevant sources intrinsic and extrinsic to the rulemaking process, in light of: (1) the structure of the Rule; (2) how the Rule relates to other laws; (3) the Rule's general purpose; and (4) the relative rationality and legal effect of various competing constructions.

(Brackets, citations, and internal quotation marks omitted).

Where a Rule's language is clear, a court "neither add[s] nor delete[s] language so as to reflect an intent not evidenced in the plain and unambiguous language of the Rule." Williams v. State, 435 Md. 474, 490, 79 A.3d 931, 940 (2013) (brackets, citation, and internal quotation marks omitted). "Unambiguous language will be given its usual, ordinary meaning unless doing so creates an absurd result." Hurst v. State, 400 Md. 397, 417, 929 A.2d 157, 168 (2007) (citation omitted).

**Maryland Rule 4-263**

Maryland Rule 4-263 states in relevant part:

(a) **Applicability.** This Rule governs discovery and inspection in a circuit court.

**Committee note.** — This Rule also governs discovery in actions transferred from District Court to circuit court upon a jury trial demand made in accordance with Rule 4-301(b)(1)(A). See Rule 4-301(c).

(b) **Definitions.** In this Rule, the following definitions apply:

(1) Defense. "Defense" means an attorney for the defendant or a defendant who is acting without an attorney.

(2) Defense Witness. "Defense witness" means a witness whom the defense intends to call at a hearing or at trial.

(3) Oral Statement.  "Oral statement" of a person means the substance of a statement of any kind by that person, whether or not reflected in an existing writing or recording.

(4) Provide.  Unless otherwise agreed by the parties or required by Rule or order of court, "provide" information or material means (A) to send or deliver it by mail, e-mail, facsimile transmission, or hand-delivery, or (B) to make the information or material available at a specified location for purposes of inspection if sending or delivering it would be impracticable because of the nature of the information or material.

(5) State's Witness.  "State's witness" means a witness whom the State's Attorney intends to call at a hearing or at trial.

**Cross references.** — For the definition of "State's Attorney," see Rule 4-102(l).

(6) Written Statement.  "Written statement" of a person:

(A) includes a statement in writing that is made, signed, or adopted by that person;

(B) includes the substance of a statement of any kind made by that person that is embodied or summarized in a writing or recording, whether or not signed or adopted by the person;

(C) includes a statement contained in a police or investigative report; but

(D) does not include attorney work product.

(c) **Obligations of the Parties.** (1) Due Diligence.  The State's Attorney and defense shall exercise due diligence to identify all of the material and information that must be disclosed under this Rule.

(2) Scope of Obligations.  The obligations of the State's Attorney and the defense extend to material and information that must be disclosed under this Rule and that are in the possession or control of the attorney, members of the attorney's staff, or any other person who either reports regularly to the attorney's office or has reported to the attorney's office in regard to the particular case.

**Cross references.** — For the obligations of the State's Attorney, see *State v. Williams*, 392 Md. 194 (2006).

(d) **Disclosure by the State's Attorney. Without the necessity of a request, the State's Attorney shall provide to the defense:**

(1) Statements. All written and all oral statements of the defendant and **of any co-defendant** that relate to the offense charged and all material and information, including documents and recordings, that relate to the acquisition of such statements;

(2) Criminal Record. Prior criminal convictions, pending charges, and probationary status of the defendant and **of any co-defendant**;

(3) State's Witnesses. As to each State's witness the State's Attorney intends to call to prove the State's case in chief or to rebut alibi testimony: (A) the name of the witness; (B) except as provided under Code, Criminal Procedure Article, § 11-205 or Rule 16-910(b), the address and, if known to the State's Attorney, the telephone number of the witness; and (C) all written statements of the witness that relate to the offense charged;

(4) Prior Conduct. All evidence of other crimes, wrongs, or acts committed by the defendant that the State's Attorney intends to offer at a hearing or at trial pursuant to Rule 5-404(b);

(5) Exculpatory Information. All material or information in any form, whether or not admissible, that tends to exculpate the defendant or negate or mitigate the defendant's guilt or punishment as to the offense charged;

(6) Impeachment Information. All material or information in any form, whether or not admissible, that tends to impeach a State's witness, including:

(A) evidence of prior conduct to show the character of the witness for untruthfulness pursuant to Rule 5-608(b);

(B) a relationship between the State's Attorney and the witness, including the nature and circumstances of any agreement, understanding, or representation that may constitute an inducement for the cooperation or testimony of the witness;

(C) prior criminal convictions, pending charges, or probationary status that may be used to impeach the witness, but the

State's Attorney is not required to investigate the criminal record of the witness unless the State's Attorney knows or has reason to believe that the witness has a criminal record;

(D) an oral statement of the witness, not otherwise memorialized, that is materially inconsistent with another statement made by the witness or with a statement made by another witness;

(E) a medical or psychiatric condition or addiction of the witness that may impair the witness's ability to testify truthfully or accurately, but the State's Attorney is not required to inquire into a witness's medical, psychiatric, or addiction history or status unless the State's Attorney has information that reasonably would lead to a belief that an inquiry would result in discovering a condition that may impair the witness's ability to testify truthfully or accurately;

(F) the fact that the witness has taken but did not pass a polygraph examination; and

(G) **the failure of the witness to identify the defendant or a co-defendant;**

**Cross references.** — See *Brady v. Maryland*, 373 U.S. 83 (1963); *Kyles v. Whitley*, 514 U.S. 419 (1995); *Giglio v. U.S.*, 405 U.S. 150 (1972); *U.S. v. Agurs*, 427 U.S. 97 (1976); *Thomas v. State*, 372 Md. 342 (2002); *Goldsmith v. State*, 337 Md. 112 (1995); and *Lyba v. State*, 321 Md. 564 (1991).

(7) Searches, Seizures, Surveillance, and Pretrial Identification. **All relevant material or information regarding:**

(A) specific searches and seizures, eavesdropping, and electronic surveillance including wiretaps; and

(B) **pretrial identification of the defendant by a State's witness;**

(8) Reports or Statements of Experts. As to each expert consulted by the State's Attorney in connection with the action:

(A) the expert's name and address, the subject matter of the consultation, the substance of the expert's findings and opinions, and a summary of the grounds for each opinion;

(B) the opportunity to inspect and copy all written reports or statements made in connection with the action by the expert, including the results of any physical or mental examination, scientific test, experiment, or comparison; and

(C) the substance of any oral report and conclusion by the expert;

(9) Evidence for Use at Trial.  The opportunity to inspect, copy, and photograph all documents, computer-generated evidence as defined in Rule 2-504.3(a), recordings, photographs, or other tangible things that the State's Attorney intends to use at a hearing or at trial; and

(10) Property of the Defendant.  The opportunity to inspect, copy, and photograph all items obtained from or belonging to the defendant, whether or not the State's Attorney intends to use the item at a hearing or at trial.

. . .

(g) **Matters Not Discoverable.** (1) By Any Party.  Notwithstanding any other provision of this Rule, neither the State's Attorney nor the defense is required to disclose (A) the mental impressions, trial strategy, personal beliefs, or other privileged attorney work product or (B) any other material or information if the court finds that its disclosure is not constitutionally required and would entail a substantial risk of harm to any person that outweighs the interest in disclosure.

(2) By the Defense.  The State's Attorney is not required to disclose the identity of a confidential informant unless the State's Attorney intends to call the informant as a State's witness or unless the failure to disclose the informant's identity would infringe a constitutional right of the defendant.

. . .

(j) **Continuing Duty to Disclose.**  Each party is under a continuing obligation to produce discoverable material and information to the other side.  A party who has responded to a request or order for discovery and who obtains further material information shall supplement the response promptly.

. . .

(n) **Sanctions.**  If at any time during the proceedings the court finds that a party has failed to comply with this Rule or an order issued pursuant to this

Rule, the court may order that party to permit the discovery of the matters not previously disclosed, strike the testimony to which the undisclosed matter relates, grant a reasonable continuance, prohibit the party from introducing in evidence the matter not disclosed, grant a mistrial, or enter any other order appropriate under the circumstances. The failure of a party to comply with a discovery obligation in this Rule does not automatically disqualify a witness from testifying. If a motion is filed to disqualify the witness's testimony, disqualification is within the discretion of the court.

(Emphasis added).

### Collins v. State

In <u>Collins v. State</u>, 373 Md. 130, 146, 133-34, 816 A.2d 919, 928, 921 (2003), this Court held that the State violated what is now Maryland Rule 4-263(d)(7)(B)[4] by failing to disclose during discovery that a State's witness had failed to identify the defendant pretrial. When this Court decided <u>Collins</u>, Maryland Rule 4-263(d)(6)(G) had not yet been adopted, and no provision of Maryland Rule 4-263 expressly required disclosure of a pretrial failure to identify a defendant or a co-defendant.

In <u>Collins</u>, 373 Md. at 132, 816 A.2d at 920, the defendant was convicted of first-degree murder and related handgun offenses. On the night of the shooting, a witness told a Baltimore City detective that he had not seen anything because he had been too far away. <u>See</u> <u>id.</u> at 133, 816 A.2d at 921. The detective included this information in a report. <u>See</u> <u>id.</u> at 133, 816 A.2d at 921. Subsequently, however, before trial, the witness identified the

_____

[4]When this Court decided <u>Collins</u> in 2003, the provision that is now Maryland Rule 4-263(d)(7)(B) was Maryland Rule 4-263(a)(2)(C). For clarity, we refer to the provision's current version when we discuss <u>Collins</u> and other cases that were decided before the amendment occurred in 2008. <u>See</u> Court of Appeals of Maryland, Rules Order at 17 (Apr. 8, 2008), <u>available at</u> http://www.mdcourts.gov/rules/rodocs/ro158supp.pdf [https://perma.cc/WU4N-N6NG].

defendant as the shooter in a photographic array and gave a contemporaneous audiotaped statement. See id. at 133-34, 816 A.2d at 921. Initially, during discovery, the State disclosed the witness's pretrial photographic array identification of the defendant, but did not disclose the pretrial failure to identify the defendant the night of the shooting, or the audiotaped statement identifying the defendant. See id. at 134, 816 A.2d at 921. Later, the State provided to the defense the audiotaped statement, but still did not disclose the pretrial failure to identify the defendant. See id. at 134, 816 A.2d at 921.

At trial, the State initially encountered difficulties in securing the witness's appearance. See id. at 134, 816 A.2d at 921. By the time that law enforcement officers located the witness, the trial's evidentiary phase had concluded. See id. at 134-35, 816 A.2d at 921. The State moved to reopen its case so that the witness could testify. See id. at 135, 816 A.2d at 921. The defendant's counsel opposed the motion to reopen on the ground that there was no necessity for reopening, as the State had simply failed to summons the witness before trial. See id. at 135, 816 A.2d at 921-22. The defendant's counsel also advised that he had just learned about the witness's pretrial failure to identify the defendant. See id. at 135, 816 A.2d at 922. The prosecutor responded that the omission of the witness's pretrial failure to identify the defendant was inadvertent. See id. at 135, 816 A.2d at 922. The trial court granted the motion to reopen. See id. at 135, 816 A.2d at 922.

The defendant's counsel moved for a continuance over the weekend to prepare for the witness's testimony, and the trial court denied the motion to continue. See id. at 143, 816 A.2d at 926-27. While testifying, the witness identified the defendant as the shooter. See id. at 139, 816 A.2d at 924. The defendant was convicted. See id. at 132, 816 A.2d at

920. The Court of Special Appeals affirmed, and this Court reversed and remanded for a new trial. See id. at 132, 149, 816 A.2d at 920, 930.

In discussing the underlying policies of Maryland Rule 4-263, this Court stated:

Inherent benefits of discovery include providing adequate information to both parties to facilitate informed pleas, ensuring thorough and effective cross-examination, and expediting the trial process by diminishing the need for continuances to deal with unfamiliar information presented at trial. Specific to the mandatory disclosure provisions of [Maryland] Rule 4-263([d]), the major objectives are to assist defendants in preparing their defense and to protect them from unfair surprise. The duty to disclose pre[]trial identifications, then, is properly determined by interpreting the plain meaning of [Maryland] Rule [4-263] with proper deference to these policies.

Id. at 146-47, 816 A.2d at 928 (quoting Williams, 364 Md. at 172, 771 A.2d at 1089).

This Court concluded that the State violated Maryland Rule 4-263(d)(7)(B) "[i]n light of the plain meaning and policies of the Rule[.]" Collins, 373 Md. at 147, 816 A.2d at 928. More specifically, this Court held that the witness's pretrial failure to identify the defendant fell "within the scope of '*relevant* material or information *regarding* pretrial identification of the defendant by a witness for the State.'" See id. at 146, 816 A.2d at 928 (quoting Md. R. 4-263(d)(7)(B)) (emphasis in original) (footnote omitted). This Court concluded that the witness's pretrial photographic array identification of the defendant made "the initial statement given on the night of the crime relevant to the veracity of the subsequent identification[,]" and that "the prior statement, [then] a prior inconsistent statement, became subject to the requirements of" Maryland Rule 4-263(d)(7)(B). Id. at 146 n.9, 816 A.2d at 928 n.9.

This Court held that the State's violation of Maryland Rule 4-263(d)(7)(B) was

prejudicial, and thus was not harmless beyond a reasonable doubt. See id. at 148, 816 A.2d at 929. This Court observed that a witness's ability to identify a defendant "at the scene of the crime is often the cardinal facet of a determination of guilt." Id. at 148, 816 A.2d at 929 (citation omitted). This Court explained: "It is not for us to determine what, if any, response the defense could have prepared had it known of the prior inconsistent statement. It is enough to find that the defense was denied an adequate opportunity to do so, to its prejudice." Id. at 148, 816 A.2d at 929.

This Court determined that the trial court abused its discretion in denying the defendant's motion for a continuance, which would have given the defendant's counsel "an opportunity to review the circumstances surrounding the undisclosed prior inconsistent statement[.]" Id. at 149, 816 A.2d at 930. In other words, a continuance "would have been appropriate to allow defense counsel adequate time to 'regroup,' investigate, and prepare as full a defense as possible." Id. at 143, 816 A.2d at 927.

**Analysis**

Here, we conclude that, as a general matter, Maryland Rule 4-263(d)(7)(B) does not, by its plain language and history, require the State to disclose during discovery a State's witness's pretrial identification of a co-defendant.

As an initial matter, we address the State's contention that, even if Maryland Rule 4-263(d)(7)(B) can be construed to apply to co-defendants, Maryland Rule 4-263(d)(7)(B) does not apply in this case because it is not clear that Copeland and Green were co-defendants. Despite the State's contention in its brief, the record is replete with references by the prosecutor identifying Copeland as a co-defendant in the circuit court. At a bench

conference, the prosecutor stated: "[T]he [S]tate intends to produce the body of [] Copeland to at least one witness[.] . . . [I]dentification of a co-defendant[,] when charged as co[-]conspirators[,] is almost as important as identification of the defendant[.]" Later at the bench conference, the prosecutor stated: "[T]his is [a] co-defendant, not the defendant himself." Still later at the bench conference, the prosecutor stated: "The co-defendant, [] Copeland, was interviewed by other people." Shortly afterward, the prosecutor stated that Green and his counsel "knew that . . . the co-defendant existed." Later, the prosecutor stated: "[W]e had a collateral thought about the co-defendant being brought in, as you said, in prison garb[.]" Shortly before Copeland was brought into the courtroom, the prosecutor stated: "We're going to ask [Carter] another question before we bring in the body of the co-defendant[.]" And, during the State's closing argument, the prosecutor stated:

> To call each other, [] Green and [] Copeland had to use outside sources to connect them together. You heard testimony about the system at the detention center. They are on separate tiers. Co-defendants, people who are charged as co-defendants in a crime, are put in separate places, and one of the reasons is so that they can't talk, can't contrive, can't discuss the cases.

The record demonstrates that, in the circuit court, the State took a different position with respect to Copeland's status as a co-defendant.

No Maryland Rule or statute defines the term "co-defendant." Black's Law Dictionary provides the following definition of the term "co-defendant": "One of two or more defendants sued in the same litigation or charged with the same crime." Codefendant, Black's Law Dictionary (10th ed. 2014).

Neither this Court nor the Court of Special Appeals has had the occasion to expressly define the term "co-defendant." Both this Court and the Court of Special

Appeals, however, have treated the term "co-defendant" in a manner that indicates that Black's Law Dictionary's definition of the term "co-defendant" is accurate—*i.e.*, that a co-defendant is an individual who is charged with the same crime as the defendant. In Veney v. State, 251 Md. 159, 164, 246 A.2d 608, 612 (1968), this Court stated: "The motion for discovery and inspection filed by the appellant asked for copies of all written statements of three **co-defendants who were charged with the same crimes with which appellant was charged.**" (Emphasis added). In Boone v. State, 3 Md. App. 11, 31, 237 A.2d 787, 800, cert. denied, 393 U.S. 872 (1968), the Court of Special Appeals stated: "The fact of the conviction or acquittal of one person charged with a crime is neither relevant nor material to the issue of the guilt or innocence of another person **charged with the same crime as a co-perpetrator**. Contrary to the position taken by the appellant, we feel that the admission of evidence of the conviction of a **co-defendant** at a prior trial would be prejudicial error." (Emphasis added).[5] And, in Boyd v. State, 321 Md. 69, 72, 581 A.2d 1, 2 (1990), this Court repeatedly referred to defendants who were charged with the same crime as co-defendants, even though they were charged separately and tried separately. Similarly, in Hickman v. State, 242 Md. 91, 91, 218 A.2d 21, 22 (1966), this Court stated that the defendant "was tried . . . with two separately indicted co-defendants[.]" And, in State v. Johnson, 367 Md. 418, 421 & n.2, 788 A.2d 628, 630 & n.2 (2002), without expressly referring to co-defendants, this Court stated that four co-conspirators were tried jointly,

---

[5]To be sure, in Boone, 3 Md. App. at 13, 237 A.2d at 790, the Court of Special Appeals stated that the appellant and three others "were jointly indicted for [] murder and robbery with a deadly weapon[.]" The Court of Special Appeals did not expressly indicate that the appellant and three other individuals were charged in the same document.

even though one of them "was indicted separately."

This Court has never determined, or, indeed, even indicated, that a co-defendant must be charged in the same charging document as the defendant. To the contrary, Maryland Rule 4-253(a) expressly permits two defendants who have been charged separately to be tried together. See Md. R. 4-253(a) ("On motion of a party, the court may order a joint trial for two or more defendants charged in separate charging documents if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."). In other words, Maryland Rule 4-253(a) explicitly allows two separately-charged individuals to be tried together as co-defendants.

The State mistakenly relies on State v. Stojetz, 705 N.E.2d 329, 338 (Ohio 1999) for the proposition that, to be a co-defendant, an individual must have been charged in the same charging document as the defendant. In Stojetz, id., the Supreme Court of Ohio reasoned that co-conspirators were not co-defendants because the defendant "was the only person charged in the indictment[.]" In Stojetz, id., the Court quoted State v. Wickline, 552 N.E.2d 913, 918 (Ohio 1990), in which, in turn, the Court quoted the following definition of "co-defendant" in Black's Law Dictionary (5th ed. 1979): "More than one defendant being sued in the same litigation; or, more than one person charged **in same complaint or indictment** with same crime." (Emphasis added).

This definition of the term "co-defendant" in the Fifth Edition of Black's Law Dictionary from 1979 is now approximately thirty-eight years old. In the meantime, there have been five newer editions of Black's Law Dictionary. The most recent edition—

namely, the Tenth Edition, published in 2014—has a different definition of the term "co-defendant" than the one that the Supreme Court of Ohio employed in Wickline and Stojetz. In contrast to the Fifth Edition, the Tenth Edition does not include in its definition of the term "co-defendant" the requirement that the individual was charged "in the same complaint or indictment." Instead, the Tenth Edition simply defines the term "co-defendant" as "[o]ne of two or more defendants . . . charged with the same crime." Codefendant, Black's Law Dictionary (10th ed. 2014).

The Tenth Edition's definition of the term "co-defendant" is consistent with Maryland case law, which indicates that a co-defendant is an individual who is charged with the same crime as the defendant. To the extent that an older edition of Black's Law Dictionary, or Ohio case law, endorses a definition of the term "co-defendant" that requires the co-defendant to be charged in the same charging document as the defendant, such a definition is inconsistent with the way in which this Court and the Court of Special Appeals have employed the term "co-defendant." In this case, it is undisputed that Copeland pled guilty to first-degree murder of Myers and conspiracy to commit first-degree murder of Myers—i.e., that he was charged with, and convicted of, the same crimes with which Green was charged. We have no difficulty in concluding that Green and Copeland were co-defendants.

As to the plain language of Maryland Rule 4-263(d)(7)(B) and whether, as a general matter, it requires disclosure of the pretrial identification of a co-defendant, Maryland Rule 4-263(d)(7)(B) provides: "Without the necessity of a request, the State's Attorney shall provide to the defense . . . [a]ll relevant material or information regarding . . . pretrial

identification of the defendant by a State's witness[.]" The word "co-defendant" is conspicuously absent from Maryland Rule 4-263(d)(7)(B).

One of the cardinal tenets of rule interpretation is that, where the language of the Rule is plain, we "neither add nor delete language" to reach a result not set forth in the clear language of the Rule. Williams, 435 Md. at 490, 79 A.3d at 940 (citation and internal quotation marks omitted). The language of Maryland Rule 4-263(d)(7)(B) is plain and unambiguous—Maryland Rule 4-263(d)(7)(B) applies only to pretrial identifications of "the defendant," and not to pretrial identifications of a co-defendant. Significantly, where Maryland Rule 4-263(d) applies to co-defendants, the language of the Rule says as much; the word "co-defendant" is found in three of Maryland Rule 4-263(d)'s other provisions. First, Maryland Rule 4-263(d)(1) requires the State to disclose "[a]ll written and all oral statements of the defendant and of any co-defendant that relate to the offense charged and all material and information . . . that relate to the acquisition of such statements[.]" Second, Maryland Rule 4-263(d)(2) requires the State to disclose "[p]rior criminal convictions, pending charges, and probationary status of the defendant and of any co-defendant[.]" And third, Maryland Rule 4-263(d)(6)(G) requires the State to disclose "[a]ll material or information in any form, whether or not admissible, that tends to impeach a State's witness, including . . . the failure of the witness to identify the defendant or a co-defendant[.]"

Each party contends that Maryland Rule 4-263(d)(6)(G) supports its position. Green asserts that, by requiring the State to disclose a pretrial failure to identify a co-defendant, Maryland Rule 4-263(d)(6)(G) implies that the State must also routinely disclose a pretrial identification of a co-defendant. By contrast, the State argues that, by

referring to co-defendants, Maryland Rule 4-263(d)(6)(G)—as well as Maryland Rule 4-263(d)(1) and (d)(2)—establish that the lack of a reference to co-defendants in Maryland Rule 4-263(d)(7)(B) was intentional. In our view, the State has the better part of the argument. Maryland Rule 4-263(d)(6)(G), (d)(1), and (d)(2) demonstrate that, where a provision of Maryland Rule 4-263 applies to co-defendants, the provision explicitly states that it applies to co-defendants. The plain language of Maryland Rule 4-263(d)(7)(B) supports the conclusion that Maryland Rule 4-263(d)(7)(B) applies only to the defendant, and not to co-defendants.[6]

Our interpretation of Maryland Rule 4-263(d)(7)(B) is also supported by the circumstance that Maryland Rule 4-263(d)(7)(B) is not the only provision of Maryland Rule 4-263(d) that expressly refers to the defendant, but does not apply to a co-defendant.

---

[6]Contrary to Green's position, there is a reasonable explanation as to why Maryland Rule 4-263(d)(6)(G) requires disclosure of a pretrial failure to identify a co-defendant, whereas Maryland Rule 4-263(d)(7)(B) does not require disclosure of a pretrial identification of a co-defendant. Specifically, Maryland Rule 4-263(d)(7)(B) does not share Maryland Rule 4-263(d)(6)(G)'s purpose of disclosing impeachment material to the defense. Maryland Rule 4-263(d)(6) requires the State to disclose "[a]ll material or information in any form, whether or not admissible, that tends to impeach a State's witness[.]" A failure to identify a co-defendant pretrial clearly falls under this category, as it would cast doubt on any subsequent identification of the defendant by the witness. If a witness fails to identify a co-defendant, but identifies the defendant, this circumstance would call into question the witness's credibility, the witness's ability to observe, and the witness's ability to recall.

However, where, as here, a witness identifies a co-defendant before trial, this circumstance does not provide any grounds for impeachment under Maryland Rule 4-263(d)(6), as the witness's pretrial identification of the co-defendant would not constitute impeachment material. In short, a failure to identify a co-defendant pretrial is impeachable; a pretrial identification of a co-defendant is not. The rationale underlying the requirement of Maryland Rule 4-263(d)(6)(G) to disclose the failure to identify a co-defendant pretrial does not extend to the requirement of Maryland Rule 4-263(d)(7)(B) to disclose pretrial identifications of the defendant.

This leads to the conclusion that Maryland Rule 4-263(d) expressly delineates when provisions apply to the defendant, but not a co-defendant. In addition to Maryland Rule 4-263(d)(7)(B), three other provisions of Maryland Rule 4-263(d) apply only to the defendant. Maryland Rule 4-263(d)(4) requires the State to disclose "[a]ll evidence of other crimes, wrongs, or acts committed by **the defendant** that the State's Attorney intends to offer at a hearing or at trial pursuant to Rule 5-404(b)[.]" (Emphasis added). Maryland Rule 4-263(d)(10) requires the State to provide "[t]he opportunity to inspect, copy, and photograph all items obtained from or belonging to **the defendant**, whether or not the State's Attorney intends to use the item at a hearing or at trial." (Emphasis added). And, Maryland Rule 4-263(d)(5) requires the State to disclose "[a]ll material or information in any form, whether or not admissible, that tends to exculpate **the defendant** or negate or mitigate **the defendant's** guilt or punishment as to the offense charged[.]" (Emphasis added). Like Maryland Rule 4-263(d)(7)(B), Maryland Rule 4-263(d)(4), (d)(10), and (d)(5) are provisions that, by their plain language, extend the State's discovery obligations to matters involving only the defendant, not a co-defendant. As such, Maryland Rule 4-263(d)(7)(B) is not an anomaly. Just as we would not read into Maryland Rule 4-263(d)(4), (d)(10), or (d)(5) a requirement that the State's discovery obligations include a co-defendant as well as the defendant, we would not alter the plain language of Maryland Rule 4-263(d)(7)(B). In short, certain provisions of Maryland Rule 4-263(d) do not require the State to disclose information that relates to a co-defendant. To accept Green's position that, as a general matter, Maryland Rule 4-263(d)(7)(B) applies to pretrial identifications of both the defendant and a co-defendant would read into the Rule language that is not

- 44 -

there, potentially affecting interpretation of other provisions of the Rule, which also only apply to the defendant.

We acknowledge that there may be cases, such as this one, where a defendant alleges that a pretrial identification of a co-defendant is relevant and, thus, should be disclosed under Maryland Rule 4-263(d)(7)(B). In such instances, however, the correct resolution is not to read into Maryland Rule 4-263(d)(7)(B) the requirement that the State disclose pretrial identifications of a co-defendant. Instead, the proper inquiry is whether the pretrial identification of the co-defendant constitutes "relevant material or information regarding . . . pretrial identification of the defendant" under Maryland Rule 4-263(d)(7)(B). Stated otherwise, a defendant's allegation of prejudice based on the nondisclosure of a pretrial identification of a co-defendant does not require departing from the plain meaning of Maryland Rule 4-263(d)(7)(B)'s language.

We conclude that the language of Maryland Rule 4-263(d)(7)(B) is unambiguous because it plainly does not require disclosure of the pretrial identification of a co-defendant. Maryland Rule 4-263(d)(7)(B) does not become ambiguous when considered together with Maryland Rule 4-263(d)(6)(G), which requires the disclosure of the failure to identify a co-defendant pretrial. These are separate provisions of Maryland Rule 4-263(d), and, like other provisions, reflect instances in which the Rule applies to the defendant, or to the defendant and a co-defendant. Our holding in this case fully comports with Maryland Rule 4-263(d)'s purposes of preventing unfair surprise and assisting in the preparation of a defense. Because Maryland Rule 4-263(d)(7)(B) is unambiguous, we decline to add the phrase "or a co-defendant" "so as to reflect an intent not evidenced in the plain and

- 45 -

unambiguous language of the Rule." Williams, 435 Md. at 490, 79 A.3d at 940 (brackets,

citation, and internal quotation marks omitted).

Given that Maryland Rule 4-263(d)(7)(B) is unambiguous, we are not required to

examine its history, but we elect to do so "as a confirmatory process." State v. Rice, 447

Md. 594, 623, 136 A.3d 720, 737 (2016) (citation and internal quotation marks omitted).

In 1977, this Court adopted a predecessor of Maryland Rule 4-263, former Maryland Rule

741. Former Maryland Rule 741(a) was entitled "Disclosure Without Request," and stated:

> Without the necessity of a request by the defendant, the State's Attorney shall furnish to the defendant:
>
> 1. Any material or information within his possession or control which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce his punishment therefor; [and]
>
> 2. Any relevant material or information regarding: (a) specific searches and seizures, wire taps and eavesdropping, (b) the acquisition of statements made by the defendant, and (c) **pretrial identification of the defendant by a witness for the State.**

(Emphasis added). Thus, like current Maryland Rule 4-263(d)(7)(B), former Maryland

Rule 741(a)(2)(c) applied only to disclosure of pretrial identifications of the defendant, not

a co-defendant.

In 1984, without substantive amendment, former Maryland Rule 741(a)(2)(c) was

replaced by Maryland Rule 4-263(a)(2)(C). In 2007, Maryland Rule 4-263(a)(2)(C)

remained identical to former Maryland Rule 741(a)(2)(c), except that the words "by the

defendant" had been deleted from the phrase "[w]ithout the necessity of a request by the

defendant," so that the Rule read, in pertinent part, "[w]ithout the necessity of a request,

the State's Attorney shall furnish to the defendant: . . . [] Any relevant material or

information regarding: . . . pretrial identification of the defendant by a witness for the State."

On September 26, 2007, the Rules Committee submitted its One Hundred Fifty-Eighth Report to this Court. Rules Committee, One Hundred Fifty-Eighth Report at 3 (Sept. 26, 2007), available at http://www.mdcourts.gov/rules/reports/158thReport.pdf [https://perma.cc/7U62-CPYN]. The Rules Committee proposed making several amendments to Maryland Rule 4-263, including adding in Maryland Rule 4-263(b)(3) a requirement that the State provide "[a]ny material or information in any form, whether or not admissible, in the possession or control of the State, . . . that tends to impeach a witness[.]" Id. at 109-10. The Rules Committee proposed replacing Maryland Rule 4-263(a)(2)(C)—which required the State to disclose a pretrial identification of the defendant—with Maryland Rule 4-263(b)(4)(C) without substantive amendment. See id. at 110. In proposed Maryland Rule 4-263(b)(4)(C), the Rules Committee recommended replacing the word "furnish" with the word "provide," and recommended adding the phrase "Except for the privileged work product of the State's Attorney as defined in subsection (d)(1) of this Rule" to the beginning of the sentence. Id. at 109. The Rules Committee did not propose any changes to the phrase "pretrial identification of the defendant by a witness for the State." Id. at 110. In other words, the Rules Committee did not propose adding a requirement that the State disclose a pretrial identification of a co-defendant. See id.

The Rules Committee proposed a Committee Note stating in pertinent part: "Examples of material and information that must be disclosed pursuant to subsections (b)(2) and (3) of this Rule if within the possession or control of the State . . . include: . . .

- 47 -

the [pretrial] failure of a witness to make an identification[.]" Id. The Rules Committee, however, did not include in the text of proposed Maryland Rule 4-263 a requirement to disclose a pretrial failure to make an identification.

In a Rules Order dated December 4, 2007, this Court deferred consideration of the proposed amendments to Maryland Rule 4-263 "pending further study by this Court[.]" Court of Appeals of Maryland, Rules Order at 3 (Dec. 4, 2007), available at http://www. mdcourts.gov/rules/rodocs/ro158.pdf [https://perma.cc/2CRL-8QLL].

On March 25, 2008, the Rules Committee submitted a Supplement to the One Hundred Fifty-Eighth Report. Rules Committee, Supplement to One Hundred Fifty-Eighth Report at 1 (March 25, 2008), available at http://www.mdcourts.gov/rules/reports/ 158supplementappx.pdf [https://perma.cc/SM3F-A7QZ]. In the Supplement, the Rules Committee explained why this Court had deferred consideration of the proposed amendments to Maryland Rule 4-263:

> At the hearing held on [the One Hundred Fifty-Eighth] Report[] on December 3, 2007, concerns were expressed by a number of prosecutors and others with respect to certain aspects of the recommended changes to [Maryland] Rules 4-262 and 4-263, principally the latter. Members of the Court inquired whether, in formulating its recommendations, the Rules Committee had considered the [ABA Standards], and the answer was that those Standards had not been considered. In light of the controversy with respect to some of the [Rules] Committee's proposals, the Court deferred action on them.

Id. The Rules Committee stated: "Although the Rules Committee has now given consideration to the ABA Standards and has crafted [Maryland] Rule[] 4-263 in closer harmony to them, its recommendations continue to depart from them in some respects." Id. at 3.

With regard to pretrial identifications, the Rules Committee proposed adding Maryland Rule 4-263(d)(6)(G), which would require the State to disclose a witness's failure "to identify the defendant or a co-defendant" pretrial. Id. at 84. Significantly, however, the Rules Committee did not propose adding a reference to co-defendants to the provision that required disclosure of a pretrial identification of the defendant. See id. In other words, the Rules Committee proposed changing Maryland Rule 4-263(a)(2)(C) to Maryland Rule 4-263(d)(7)(B) without substantive amendment. See id. Specifically, proposed Maryland Rule 4-263(d)(7)(B) stated: "Without the necessity of a request, the State's Attorney shall provide to the defense . . . [a]ll relevant material or information regarding . . . pretrial identification of the defendant by a State's witness[.]" Id. at 82, 84. This language is identical to that of current Maryland Rule 4-263(d)(7)(B).[7]

Proposed Maryland Rule 4-263(d)(7)(B) was not as broad as its counterpart, ABA Standard 11-2.1(a)(vii), which states:

> The prosecution should, within a specified and reasonable time prior to trial, disclose to the defense the following information and material and permit inspection, copying, testing, and photographing of disclosed documents or tangible objects . . . **[a]ny material, documents, or information relating to lineups, showups, and picture or voice [pretrial] identifications in relation to the case.**

ABA Standards, available at https://www.americanbar.org/publications/criminal_justice_

---

[7]In a Rules Order dated April 8, 2008, this Court rescinded the existing Maryland Rule 4-263 and added a new Maryland Rule 4-263. See Court of Appeals of Maryland, Rules Order at 2 (Apr. 8, 2008), available at http://www.mdcourts.gov/rules/rodocs/ ro158supp.pdf [https://perma.cc/WU4N-N6NG]. Since then, this Court has amended other provisions of Maryland Rule 4-263 multiple times, but this Court has never amended Maryland Rule 4-263(d)(7)(B).

section_archive/crimjust_standards_discovery_blk.html#2.1 [https://perma.cc/3UWQ-4SQQ] (emphasis added).

In Appendix C to the Supplement,[8] the Rules Committee addressed the differences between proposed Maryland Rule 4-263(d)(7)(B) and ABA Standard 11-2.1(a)(vii):

> [Maryland] Rule 4-263(d)(7), when coupled with [Maryland Rule 4-263](d)(6)(G)[,] is generally consistent with [ABA Standard 11-2.1], but there are some differences. As to [pretrial] identification evidence, [] ABA Standard [11-2.1(a)(vii)] would seem to apply to the [pretrial] identification (or not) of anyone; **[Maryland Rule 4-263](d)(6)(G) and (d)(7) cover only [pretrial] identifications of the defendant or co-defendant by a State's witness (or [pretrial] failure to make such an identification). [Maryland Rule 4-263](d)(7) follows the current Rule, and the Rules Committee saw no need to expand the Rule.** The ABA Standard requires only that the State inform the defense of electronic surveillance and does not require disclosure of relevant material concerning it. To that extent, subsection (d)(7) is broader than the ABA Standard. With respect to the disclosure of information regarding specific searches and seizures, subsection (d)(7) is comparable to ABA Standard 11-2.1(d).

Rules Committee, Supplement to One Hundred Fifty-Eighth Report at 41-42 (emphasis added).

From our perspective, there is nothing in the history of Maryland Rule 4-263 to indicate that the omission of the word "co-defendant" in Maryland Rule 4-263(d)(7)(B) was unintentional or an oversight. We are aware that Green contends that the history of Maryland Rule 4-263(d)(7)(B) demonstrates an intent to include co-defendants and to harmonize the Rule with the ABA Standards concerning discovery. What Green draws our attention to about the history of Maryland Rule 4-263(d)(7)(B) is not persuasive. The

---

[8]Unlike a Committee Note, an appendix to a Report of the Rules Committee does not become incorporated into the Maryland Rules.

passage in Appendix C is a far cry from evidencing an intent to have Maryland Rule 4-263(d)(7)(B) apply to pretrial identifications of a co-defendant. The passage references the respective requirements of Maryland Rule 4-263(d)(6)(G) and Maryland Rule 4-263(d)(7)(B), and explicitly states an intent not to expand Maryland Rule 4-263(d)(7)(B). ABA Standard 11-2.1(a)(vii) is a broad standard that applies to numerous discovery requirements, and the desire to harmonize Maryland Rule 4-263 with the ABA Standards in no way reflects the purpose to expand Maryland Rule 4-263(d)(7)(B) to require disclosure of pretrial identifications of co-defendants.

It is significant that the Rules Committee stated that it "saw no need to expand" Maryland Rule 4-263 with respect to pretrial identifications or otherwise. It is reasonable to infer from this statement that the Rules Committee considered, but intentionally refrained from, adding a reference to co-defendants to proposed Maryland Rule 4-263(d)(7)(B). Indeed, the Rules Committee included a reference to co-defendants in proposed Maryland Rule 4-263(d)(6)(G), which would require the State to disclose a failure "to identify the defendant or a co-defendant" pretrial. Rules Committee, Supplement to One Hundred Fifty-Eighth Report at 84. And, tellingly, in Appendix C, the Rules Committee stated that proposed Maryland Rule 4-263(d)(6)(G) lacked a counterpart in ABA Standard 11-2.1. See id. at 40. In other words, the Rules Committee included a reference to co-defendants in proposed Maryland Rule 4-263(d)(6)(G) on its own initiative, not in the course of following ABA Standard 11-2.1. This circumstance demonstrates that the Rules Committee was well aware that it could include a reference to co-defendants in proposed Maryland Rule 4-263(d)(7)(B). And, by its own assessment, the Rules

Committee knew that ABA Standard 11-2.1(a)(vii) "would seem to apply to the identification (or not) of anyone[.]" Rules Committee, Supplement to One Hundred Fifty-Eighth Report at 41. Nonetheless, the Rules Committee "saw no need to expand" Maryland Rule 4-263's requirements regarding disclosure of pretrial identifications. Id. This history reinforces our conclusion that the absence of a reference to a co-defendant in proposed Maryland Rule 4-263(d)(7)(B) was intentional.

In sum, Maryland Rule 4-263(d)(7)(B)'s plain language and history compel our holding that Maryland Rule 4-263(d)(7)(B) does not require as a general matter the State to disclose during discovery a State's witness's pretrial identification of a co-defendant. We hold that the State's obligation under Maryland Rule 4-263(d)(7)(B) is governed by its plain language—*i.e.*, the State is obligated to disclose "relevant material or information regarding . . . pretrial identification of the defendant[.]" There may be cases, such as this one, in which a defendant contends that a pretrial identification of a co-defendant constitutes relevant information regarding the pretrial identification of the defendant. Below in Part II, we address whether the pretrial identification of the co-defendant in this case was subject to disclosure under Maryland Rule 4-263(d)(7)(B) as relevant material or information regarding the pretrial identification of the defendant.

## II. Pretrial Identification of the Co-Defendant in this Case

### The Parties' Contentions

Green contends that, under this case's circumstances, Maryland Rule 4-263(d)(7)(B) required the State to disclose Carter's identification of Copeland as the person who was not the shooter because that identification necessarily implicated Green as the

shooter.  Stated otherwise, Green argues that Carter's identification constituted "relevant material or information regarding . . . pretrial identification of the defendant[.]" Md. R. 4-263(d)(7)(B).  Green asserts that the Court of Special Appeals erred in concluding that adopting his position would cause the State's discovery obligations to depend on the defense's trial strategy.  Green maintains that the record demonstrates that the State intended to introduce Carter's identification of Copeland, regardless of his trial strategy.  Green contends that, had his trial counsel known of Carter's pretrial identification of Copeland, the defense's trial strategy might have differed.

Green argues that his position is supported by Collins, 373 Md. at 146 n.9, 816 A.2d at 928 n.9, in which this Court commented that "the State was required by [Maryland Rule] 4-263[(d)(7)(B)] to produce not only statements containing the identification, but also any and all other statements made by [the State's witness] regarding who[m] he saw or did not see commit the act."  Green asserts that Carter's pretrial identification of Copeland was a statement regarding whom she did not see perform the shooting.  Green contends that the importance of Carter's identification of Copeland establishes that the error was not harmless.  Green argues that the prosecutor's reliance on Carter's identification during the State's closing argument demonstrated the importance of Carter's identification to the State's case.

The State responds that Maryland Rule 4-263(d)(7)(B)'s use of the words "relevant" and "regarding" refer to circumstances surrounding a pretrial identification of a defendant—not a pretrial identification of a co-defendant.  The State contends that requiring the disclosure of a pretrial identification of a co-defendant expands the meaning

of "relevant" and "regarding," such that Maryland Rule 4-263(d)(7)(B) would fail to provide clear notice to the State regarding its discovery obligations. The State argues that, although Carter testified that she told detectives that she could identify Copeland, it is unclear whether this occurred "pretrial." The State asserts that, in the event of a discovery violation, the circuit court should impose the least severe sanction, that is consistent with Maryland Rule 4-263's purposes, and that, in this case, the proper remedy was permitting cross-examination of Carter about her pretrial identification of Copeland.

**Relevant Case Law**

In Williams, 364 Md. at 164, 771 A.2d at 1084, this Court held that a law enforcement officer's surveillance observations of the defendant, if used by the State for purposes of identification, is a pretrial identification subject to disclosure under Maryland Rule 4-263(d)(7)(B). In Williams, id. at 178, 167-68, 771 A.2d at 1092, 1086, this Court determined that the State violated Maryland Rule 4-263(d)(7)(B) where, before trial, a prosecutor proffered that a law enforcement officer could not identify the defendant, but, at trial, the officer testified that he had made surveillance observations of the defendant and then identified the defendant in court. Of particular significance to this case, this Court concluded that the information that may be subject to mandatory disclosure under Maryland Rule 4-263(d)(7)(B) is not limited to State-orchestrated identification procedures, such as showups, lineups, and photographic arrays. See id. at 172-73, 771 A.2d at 1089.

In Williams, id. at 164-65, 771 A.2d at 1084, the defendant was charged with distribution of cocaine; the charges stemmed from the execution of a search warrant at an

apartment. The State contended that, shortly before execution of the warrant, the defendant entered the apartment, which was under law enforcement surveillance, to deliver cocaine. See id. at 165, 771 A.2d at 1085. In Williams, id. at 166, 771 A.2d at 1085, in response to a request for disclosure from the defendant's counsel, the State filed discovery stating that the defendant had not been identified through a pretrial identification procedure. Subsequently, the defendant moved to suppress any unlawful pretrial identifications of him. See id. at 166, 771 A.2d at 1085. Immediately prior to a hearing on the motion to suppress, the prosecutor proffered that the law enforcement officer's testimony would not be an identification because the officer would testify only as to the general description of a man who entered the apartment. See id. at 166, 771 A.2d at 1085. At the hearing, the prosecutor again proffered that, while surveilling an apartment for suspected drug activity, a law enforcement officer had seen a man enter the apartment. See id. at 167, 771 A.2d at 1086. The prosecutor also proffered that the officer had observed "the stature, the size, the height," and race of the man who entered the apartment. See id. at 167, 771 A.2d at 1086. The prosecutor proffered, however, that the officer would not be able to identify the man who entered the apartment as the defendant. See id. at 166-67, 771 A.2d at 1085-86. The trial court found that no pretrial identification of the defendant had occurred, and determined that the State had complied with its discovery obligations. See id. at 167, 771 A.2d at 1086. At an unrelated pretrial motion hearing, the prosecutor again indicated that the law enforcement officer could identify the man who entered the apartment only by "size, height, and weight[.]" See id. at 167, 771 A.2d at 1086.

Contrary to the prosecutor's multiple proffers, at trial, the officer identified the

defendant as the man who entered the apartment. See id. 167-68, 771 A.2d at 1086. The defendant's counsel objected and moved to strike the officer's identification of the defendant. See id. at 168, 771 A.2d at 1086. The trial court overruled the objection and denied the motion to strike. See id. at 168, 771 A.2d at 1086.

Only one State's witness other than the officer placed the defendant in the apartment on the night in question. See id. at 165, 771 A.2d at 1085. Testifying pursuant to a plea agreement, the witness stated that the defendant entered the apartment, put a foil-wrapped package on the kitchen counter, and said to "take whatever off the top." Id. at 165, 771 A.2d at 1085. After the defendant left the apartment, law enforcement officers executed a search warrant and found cocaine in the apartment. See id. at 165, 771 A.2d at 1084-85.

After being convicted, the defendant moved for a new trial, contending that the State had violated Maryland Rule 4-263 by failing to disclose during discovery the officer's pretrial identification of the defendant. See Williams, 364 Md. at 168, 771 A.2d at 1086. The trial court denied the motion for a new trial, determining that the State had not withheld a pretrial identification of the defendant by the officer, as the prosecutor did not know that the officer had made an out-of-court identification of the defendant and would identify the defendant at trial. See id. at 168, 771 A.2d at 1086-87. In other words, the trial court found that the inaccuracy in the prosecutor's proffer had been inadvertent because the prosecutor had been surprised by the officer's identification of the defendant. See id. at 169 n.9, 168, 771 A.2d at 1087 n.9, 1086. The Court of Special Appeals affirmed, and this Court reversed and remanded for a new trial. See id. at 168, 181, 771 A.2d at 1087, 1094.

As a threshold matter, in Williams, id. at 172, 771 A.2d at 1088-89, this Court

observed that the case involved an issue of first impression—namely, whether a law enforcement officer's surveillance observations can be subject to mandatory disclosure under Maryland Rule 4-263(d)(7)(B). The State contended that Maryland Rule 4-263(d)(7)(B)

> is limited to [S]tate-orchestrated identification procedures, such as a photographic array, a show[]up, or a line[]up, because a purpose of the discovery disclosures is to 'force the defendant to file certain motions before trial, including a motion to suppress . . .' and a [law enforcement] officer's surveillance observations would not be the subject of such a pretrial motion.

Id. at 172, 771 A.2d at 1089 (ellipsis in original) (citation omitted).

> This Court "f[ou]nd the State's position faulty[,]" and stated in relevant part:

> Simply because we recognize the relationship between the discovery and pretrial motions rules, in that discovery is necessary so that mandatory pretrial motions can be filed, does not mean that we limit discovery to strictly that which may be utilized in support of a pretrial motion. . . . Relevancy is not limited to material or information which would tend to support a motion to suppress. Material or information is also producible under [Maryland] Rule 4-263[(d)(7)] if it supports the State's proposed use of validly obtained material or information and the denial of a defendant's suppression motion.

> Generally speaking, discovery disclosures may, indeed, assist a defendant in determining whether certain motions can be filed prior to trial[,] and thus expedite the trial process; however, the fact that discovery may advance that goal is not dispositive of other laudable goals. We have repeatedly insisted that discovery rules should assist the defendant in preparing a defense and protect him [or her] from surprise. One can hardly imagine a greater obstacle to a[ defendant's] defense than the State's declaration prior to trial that the only corroborating witness could not specifically identify the defendant, while the testimony of the witness at trial was nothing shy of a clear and positive identification—"it was [the defendant] who is seated at the defense table . . ." Identification testimony may be outcome determinative and hence, any solid preparation of a defense demands this information. Furthermore, unlike statements made by the defendant, identification testimony naturally comes from third parties. As such, it is information with which, absent the State's disclosure, a defendant may never be familiar until trial. To prevent unfair surprise, disclosure of identification testimony is required.

Id. at 173-74, 771 A.2d at 1089-90 (second ellipsis in original) (brackets, citations, footnotes, and internal quotation marks omitted).

This Court held that the State violated Maryland Rule 4-263(d)(7)(B) by failing to provide "complete and accurate information regarding the extent to which [the officer], a witness closely identified with the State, could identify" the defendant. Id. at 178, 771 A.2d at 1092. More specifically, this Court "conclude[d] that [the officer]'s surveillance observation, if used by the State for purposes of identification, [wa]s 'relevant material regarding a pretrial identification' under [Maryland] Rule 4-263[(d)(7)(B)] and disclosure [wa]s required." Id. at 178, 771 A.2d at 1092. This Court determined that "the objectives of discovery were not realized" because discovery "not only failed to assist [the defendant] with his defense, but [also] failed to protect [the defendant] from unfair surprise." Id. at 178, 771 A.2d at 1092.

This Court rejected the State's argument that it had not violated Maryland Rule 4-263(d)(7)(B) because the prosecutor had disclosed that the officer had seen a man of the defendant's size and race enter the apartment. See id. at 175, 771 A.2d at 1090-91. This Court noted that the prosecutor had unequivocally proffered that the officer could not identify the defendant; thus, the prosecutor's proffer was inconsistent with the officer's in-court identification of the defendant. See id. at 175, 771 A.2d at 1091.

This Court concluded that the circumstance "that the [prosecutor] was 'surprised' [by the officer's in-court identification of the defendant] ha[d] no bearing on whether the defendant was prejudiced by the" prosecutor's inaccurate proffer. Id. at 176 n.21, 771 A.2d

at 1091 n.21. In other words, this Court held that "'surprise' [on the part of the prosecutor] does not excuse or mitigate the prejudice to the defendant." Id. at 176, 771 A.2d at 1091. This Court observed that "the State is charged with the knowledge of all seemingly pertinent facts related to the charge [that] are known to" law enforcement officers. Id. at 177, 771 A.2d at 1092 (citation and internal quotation marks omitted). This Court further explained why it does not matter whether a prosecutor is aware of facts that law enforcement officers know:

> If [a prosecutor]'s lack of knowledge could excuse, or even mitigate[,] the prejudicial effect of the undisclosed information, [prosecutor]s would most effectively operate in a vacuum because, by removing themselves from the privity of [law enforcement officers'] testimony and evidence, [prosecutor]s could slip beyond the grasp of discovery rules by claiming ignorance, and thereby force the defendant to enter trial unaware of the evidence to be offered against him [or her]. This is intolerable and totally adverse to one of the avowed purposes for discovery rules: *to assist the defendant in preparing his [or her] defense and prevent unfair surprise at trial*.

Id. at 177-78, 771 A.2d at 1092 (emphasis in original).

This Court held that the State's violation of Maryland Rule 4-263(d)(7)(B) was prejudicial, and thus was not harmless error, because the officer's testimony was "the only corroborating witness identification of the defendant[.]" Id. at 179, 771 A.2d at 1093 (emphasis omitted). This Court noted that "a conviction may not rest on the uncorroborated testimony of an accomplice." Id. at 179, 771 A.2d at 1093 (citation omitted). This Court determined that, if the officer had not identified the defendant, there would have been "a strong basis for moving for judgment of acquittal[.]" Id. at 179-80, 771 A.2d at 1093. This Court also observed that, at the conclusion of the bench trial, the trial court gave "great weight" to the officer's testimony. Id. at 180, 771 A.2d at 1093. Ultimately, this Court

concluded that it was likely that the State's violation of Maryland Rule 4-263(d)(7)(B) contributed to the conviction.  See id. at 181, 771 A.2d at 1094.

In Simons v. State, 159 Md. App. 562, 575, 574, 860 A.2d 416, 424, 423 (2004), the Court of Special Appeals held that the State violated Maryland Rule 4-263(d)(7)(B) by failing to disclose that, before trial, a State's witness told law enforcement officers that she had seen the defendant near the scene of the crime around the time the crime was committed.  Specifically, the Court stated:

> While we shall not attempt to delineate the "limiting principle that prevents all statements about interactions with a defendant from constituting pre-trial identifications," we are persuaded that the holding in *Williams* constrains us to conclude that, when the pretrial statement of an eyewitness directly implicates the defendant in the commission of the crime, such a statement is the equivalent of the State's test for what constitutes an identification, *i.e.*, the witness's ability to say, "this is the man."

Simons, 159 Md. App. at 575, 860 A.2d at 424.

In Simons, id. at 566, 574, 860 A.2d at 418, 423, at trial, the defendant's counsel learned that a State's witness had told officers that, on the night of a burglary, she saw the defendant near the victim's residence.  The defendant's counsel characterized the witness's statement to officers as a pretrial identification of the defendant.  See id. at 566, 860 A.2d at 418.  The defendant moved to preclude the witness from identifying the defendant at trial on the ground that the State had not disclosed the witness's pretrial identification of the defendant.  See id. at 566, 860 A.2d at 418.  The trial court denied the motion to preclude.  See id. at 566, 860 A.2d at 418.  At trial, consistent with her statement to officers, the witness testified that she had observed the defendant "'walking back and forth' in front of" the victim's residence on the night of the burglary.  Id. at 566, 860 A.2d at 418.  The

defendant was convicted, and the Court of Special Appeals reversed and remanded for a new trial. See id. at 564-65, 860 A.2d at 417.

As a threshold matter, the Court of Special Appeals observed that it needed to determine whether the witness's statement to law enforcement officers constituted a pretrial identification for the purpose of Maryland Rule 4-263(d)(7)(B). See id. at 570, 860 A.2d at 420. The Court observed that, in Williams, 364 Md. at 173, 771 A.2d 1082, this "Court dismissed the State's contention that [Maryland] Rule [4-263(d)(7)(B)] is limited to traditional pre[]trial identifications[,] such as show[]ups or line[]ups." Simons, 159 Md. App. at 571, 860 A.2d at 421. The Court of Special Appeals stated that this Court's holding in Williams led to the conclusion that, where a pretrial statement of an eyewitness "directly implicates the defendant in the commission of the crime," that statement is the equivalent of an identification, "i.e., the witness's ability to say, 'this is the man.'" Simons, 159 Md. App. at 575, 860 A.2d at 424.

In Simons, id. at 575, 860 A.2d at 423, the Court of Special Appeals determined that the witness's statement to law enforcement officers constituted a pretrial identification of the defendant, and was subject to mandatory disclosure under Maryland Rule 4-263(d)(7)(B). The Court explained that the witness's in-court identification of the defendant was an "unfair surprise [that] was prejudicial to" him. Id. at 574, 860 A.2d at 423. The Court observed that, if the defendant had known of the witness's statement to officers, that knowledge "could have influenced his decision to accept a plea bargain; he could have questioned [the witness] about the identification before trial; conducted a thorough investigation of the scene to assess [the witness]'s vantage point when she

witnessed [the defendant] at the [victim's residence]; and tested [the witness] on cross-examination." Id. at 574, 860 A.2d at 423.

The Court concluded that the State's violation of Maryland Rule 4-263(d)(7)(B) was not harmless because the witness was the only one who had observed the defendant near the victim's residence on the night of the burglary. See id. at 577-78, 860 A.2d at 425. The Court observed that, therefore, the witness's identification testimony was "crucial to" the State's case. Id. 578, 860 A.2d at 425.

**Analysis**

Here, we hold that, under this case's circumstances, Carter's pretrial identification of Copeland as the person who was not the shooter was relevant information regarding the pretrial identification of Green as the person who was the shooter, and was required to be disclosed under Maryland Rule 4-263(d)(7)(B). The pretrial identification of Copeland as the person who was not the shooter was the equivalent of the pretrial identification of Green as the shooter, where the State's theory of the case was, and its evidence showed, that Green, Copeland, and Myers were the only people at the scene of the shooting, and that Copeland was not the shooter.

As a threshold matter, we are unpersuaded by the State's contentions that the record does not establish that Carter informed law enforcement officers of her ability to identify Copeland before trial, and that Carter did not make a pretrial identification of Copeland. In affirming the convictions, the Court of Special Appeals determined that the State's discovery obligations pursuant to Maryland Rule 4-263(d)(7)(B) are limited to the plain language of the Rule, and that, because Carter's identification of Copeland was an

identification of someone other than the defendant, the State did not violate Maryland Rule 4-263(d)(7)(B). See Green, 231 Md. App. at 74, 149 A.3d at 1171. As such, the Court of Special Appeals did not expressly address the question of when Carter advised the detectives that she could identify Copeland and whether this constituted a pretrial identification.

The record demonstrates that Carter advised law enforcement officers before trial of her ability to identify Copeland as the person who was not the shooter. It is undisputed that, at trial, Carter testified that she saw two men at the scene of the shooting with Myers, and she identified Copeland as the person who was not the shooter. It is also undisputed that, one or two days after the shooting, Carter informed detectives that she was unable to describe the face of either person—*i.e.* the shooter and the person who was not the shooter. The record reflects that, at trial, Carter testified that, after the shooting, she recognized a photograph of Copeland in the newspaper. Carter was uncertain of the date on which she recognized Copeland. Carter acknowledged that, upon recognizing the photograph of Copeland, she did not call anyone or inform anyone. Green's counsel asked Carter, however: "[W]hen did you eventually tell any of the detectives that you knew who [] Copeland was?" Significantly, Carter responded: "When I went over -- over everything again with them, what I saw -- everything that I saw that day."

To be sure, Carter did not specify when she "went over everything again" with the detectives. But, twenty days before the first day of trial, the State requested a writ to compel Copeland to appear at trial. Notably, Copeland's plea agreement provided that, if either party called Copeland as a witness in this case, he would invoke his privilege against

self-incrimination in response to any question of substance. As such, the State's purpose in securing Copeland's appearance could not have been to call him as a witness. Instead, as the prosecutor acknowledged at a bench conference, the State's purpose was to have Carter identify Copeland. Specifically, the prosecutor stated: "[T]he [S]tate's intention at this time -- and this was the reason for the writ for [] Copeland[.] . . . It is the [S]tate's proffer to the court that we believe that [] Carter, upon seeing [] Copeland, will be able to positively identify him." The State's request for a writ to compel Copeland's appearance three weeks before trial leads to the inescapable conclusion that, sometime before the request for the writ—*i.e.*, pretrial—Carter told detectives that she recognized Copeland. Otherwise, there would have been no reason for the State to request the writ for Copeland's appearance, as Copeland's plea agreement with the State provided that he would invoke his Fifth Amendment privilege against self-incrimination and not answer any substantive questions.

More tellingly, though, at trial, at a bench conference during Carter's testimony, before her identification of Copeland, the prosecutor informed the circuit court: "We intend to have [] Carter specifically . . . identify [] Copeland either by face, and say, yes, that's him, or that looks like him or whatever she says, then ask her about the physique, whether that's consistent with the first or the second person or anything to that effect." In other words, before Carter's identification of Copeland, the prosecutor advised that the sole purpose of Copeland's presence was for Carter to identify him.

Equally telling, the record reveals other circumstances giving rise to the conclusion that the prosecutor intended for Carter to identify Copeland at trial—*i.e.*, that Carter had

advised detectives pretrial of her ability to identify Copeland. Before opening statements, the prosecutor stated that he wanted Copeland to appear in the courtroom during Carter's testimony so that she could identify him. During opening statement, the prosecutor said: "[Y]ou have one eyewitness putting two people, one which will be very clearly identified as [] Copeland and one that loosely identifies as [] Green, at the scene of the shooting[.]" During direct-examination of Carter, the prosecutor asked Carter whether she would be able to identify the tall, skinny man who had stood next to the Mustang's driver's door— *i.e.*, the person who was not the shooter—if he were shown to her. Carter responded in the affirmative. At a bench conference, Green's counsel expressed surprise that Carter would be able to identify Copeland. In response, the prosecutor did not claim that he too was surprised to learn that Carter could identify Copeland. Instead, the prosecutor stated that "[t]here [wa]s no surprise" because Green's counsel knew that multiple witnesses could identify Copeland. Significantly, at no time did the prosecutor advise the circuit court that he, like Green's counsel, had been unaware of Carter's ability to identify Copeland. The State's request for a writ nearly three weeks before trial, as well as the prosecutor's announcement at a bench conference and during the State's opening statement that Carter was expected to identify Copeland, demonstrate that Carter's in-court identification of Copeland was not unexpected—to the contrary, it was planned in advance based on Carter having informed detectives pretrial of her ability to identify Copeland.

Our precedent mandates the conclusion that Carter's informing detectives before trial of her ability to identify Copeland as the person who was not the shooter constituted a pretrial identification of Copeland. For purposes of Maryland Rule 4-263(d)(7)(B), the

- 65 -

phrase "pretrial identification" is not "limited to [S]tate-orchestrated identification procedures, such as a photographic array, a show[]up, or a line[]up[.]" Williams, 364 Md. at 172-73, 771 A.2d at 1089. For example, in Williams, id. at 178, 771 A.2d at 1092, this Court "conclude[d] that [a law enforcement officer]'s surveillance observation, if used by the State for purposes of identification, [wa]s 'relevant material regarding a pretrial identification'" under Maryland Rule 4-263(d)(7)(B). And, notably, in Simons, 159 Md. App. at 574-75, 860 A.2d at 423, guided by this Court's holding in Williams, the Court of Special Appeals held that a pretrial identification occurred where a witness stated to law enforcement officers that she saw the defendant near the scene of the crime around the time the crime was committed. Here, a pretrial identification of Copeland occurred when Carter informed detectives before trial that she could identify Copeland as being present with the victim but not being the shooter.

It is of no moment that Carter may or may not have informed law enforcement officers that she recognized Copeland in a photograph in a newspaper, or that the officers were not present when Carter viewed the newspaper. Just as it is unnecessary for an identification to occur during a lineup, showup, or other formal identification procedure, see Williams, 364 Md. at 172-73, 771 A.2d at 1089, it is also unnecessary for an eyewitness's recognition of a person who was at the scene of a crime to occur in front of law enforcement officers. What matters is that the eyewitness advises officers of his or her ability to identify the person. At that point, the State is charged with knowledge of the eyewitness's ability to identify the person. As we explained in Williams, id. at 177, 771 A.2d at 1092, "the State is charged with the knowledge of all seemingly pertinent facts

related to the charge [that] are known to" law enforcement officers. (Citation and internal quotation marks omitted).

Having determined that Carter made a pretrial identification of Copeland and that law enforcement officers were aware of the identification, we must next determine whether that identification was subject to mandatory disclosure under Maryland Rule 4-263(d)(7)(B). We start by reviewing Maryland Rule 4-263(d)(7)(B)'s language. Maryland Rule 4-263(d)(7)(B) does not simply require disclosure of pretrial identifications of defendants. Rather, Maryland Rule 4-263(d)(7)(B) requires disclosure of "**[a]ll relevant material or information regarding** . . . pretrial identification of the defendant by a State's witness[.]" (Emphasis added).

In Collins, 373 Md. at 146, 816 A.2d at 928, this Court underscored the importance of the phrase "relevant material or information regarding" in Maryland Rule 4-263(d)(7)(B). Specifically, this Court stated its holding as follows: "[The witness]'s prior inconsistent statement [about not seeing anyone at the scene of the crime], under the circumstances of this case, falls within the scope of '*relevant* material or information *regarding* pretrial identification of the defendant by a witness for the State.'" Id. at 146, 816 A.2d at 928 (emphasis in original) (footnote omitted). The phrase "relevant material or information regarding" is plainly not limited to the mere occurrence of a pretrial identification of a defendant.

Instead, the phrase "relevant material or information regarding" renders Maryland Rule 4-263(d)(7)(B) applicable to more than just a pretrial identification procedure identifying the defendant. For example, in Collins, id. at 146, 816 A.2d at 928, this Court

- 67 -

held that Maryland Rule 4-263(d)(7)(B) requires disclosure of a failure to identify the defendant pretrial. And, in Williams, 364 Md. at 178, 167-68, 180, 771 A.2d at 1092, 1086, 1093, this Court concluded that the State violated Maryland Rule 4-263(d)(7)(B) where, contrary to a prosecutor's proffer, a law enforcement officer testified that he had observed the defendant during surveillance, where the officer had not participated in a pretrial photographic array or lineup identifying the defendant. Thus, in both Collins and Williams, this Court found violations of Maryland Rule 4-263(d)(7)(B), even though there had not been a pretrial identification procedure, such as a photographic array or lineup, in which the defendant was identified.[9]

In addition to considering Maryland Rule 4-263's language, we also take into account its purposes—"to assist defendants in preparing their defense and to protect them from unfair surprise." Collins, 373 Md. at 146, 816 A.2d at 928 (quoting Williams, 364 Md. at 172, 771 A.2d at 1089). "The duty to disclose pre[]trial identifications . . . is properly determined by interpreting the plain meaning of [Maryland] Rule [4-263] with

---

[9]To be subject to mandatory disclosure under Maryland Rule 4-263(d)(7)(B), material or information regarding pretrial identification of the defendant must be "relevant" to the identification of the defendant, but it is not necessary that the material or information be found to be "material." Although one of Maryland Rule 4-263's predecessors limited discoverable information to that which was "material," Maryland Rule 4-263 includes no such limitation. See Williams, 364 Md. at 171 & n.12, 771 A.2d at 1088 & n.12. For Maryland Rule 4-263's purposes, generally, information or material is "relevant if it reasonably is calculated to lead to the discovery of admissible evidence and their probative value is not outweighed by any privacy interests, confidentiality, privilege, or other conflicting interest, including the burden of production." Cole v. State, 378 Md. 42, 63, 835 A.2d 600, 611-12 (2003). By contrast, under one of Maryland Rule 4-263's predecessors, to obtain information during discovery, the defendant was required to show that the information "may be material to the preparation of his [or her] defense and that the request is reasonable."

proper deference to these policies." Collins, 373 Md. at 146-47, 816 A.2d at 928 (quoting Williams, 364 Md. at 172, 771 A.2d at 1089). Guided by Maryland Rule 4-263(d)(7)(B)'s language and purposes, as well as our holdings in Collins and Williams, we conclude that a pretrial identification of a co-defendant is relevant information regarding pretrial identification of the defendant where the pretrial identification of the co-defendant is effectively the equivalent of a pretrial identification of the defendant. Stated otherwise, under the circumstances of this case, information regarding the pretrial identification of Copeland was relevant information regarding the pretrial identification of Green.

The facts of this case serve as a prime example of a pretrial identification of a co-defendant being effectively the equivalent of a pretrial identification of the defendant. It is undisputed that, at the time of the shooting, Myers, the victim, was in his truck, which was facing Copeland's Mustang. Carter testified that, as she was driving by the scene of the shooting, she saw two men. One man was shorter and stouter, wearing a hoodie, and standing off to the side of the road. The other man was taller and skinnier, wearing a hat with snowflakes, and standing near the Mustang's driver's seat. Carter heard a gunshot, looked into her driver's side-view mirror, and saw the shorter, stouter man shoot into the truck three times. Carter had not gotten a look at the face of the shorter, stouter man—*i.e.*, the shooter—because his hood was up. Carter had, however, gotten a look at the face of the tall, thin man—*i.e.*, the person who was not the shooter. The record establishes that prior to trial Carter informed law enforcement officers of her ability to identify Copeland as the person who was not the shooter. And, at trial, Carter unequivocally identified Copeland as the person who was not the shooter. The State's theory of the case was that

Green was the person with Copeland and was the shooter.

Given the State's theory of the case, Carter's identification of Copeland as the person who was not responsible for the shooting established that Green was the shooter. Carter's pretrial identification of Copeland was in essence the equivalent of a pretrial identification of Green as the shooter. As such, Carter's pretrial identification of Copeland was relevant information regarding the pretrial identification of Green, and was subject to mandatory disclosure under Maryland Rule 4-263(d)(7)(B).

We disagree with the State's assertion at oral argument that our holding requires prosecutors to be "soothsayers" by predicting what defense strategy will be. Indeed, we conclude that the Court of Special Appeals erred in determining that the State's discovery obligations would depend on the defendant's trial strategy, "which often will be unknown prior to trial." Green, 231 Md. App. at 74, 149 A.3d at 1171. The Court of Special Appeals reasoned that Carter's identification of Copeland as the person who was not the shooter implicated Green as the shooter only because Green testified that he, Copeland, and Myers were the only ones at the scene of the shooting. See id. at 73-74, 149 A.3d at 1171. The record, however, establishes that Carter told detectives before trial that she could identify Copeland as the person who was not the shooter, and that the State intended to use Carter's identification of Copeland at trial in its case-in-chief. We have no reason to imagine that there will not be other cases in which the State may be aware that a witness's pretrial identification of a co-defendant will effectively identify the defendant. Our holding simply requires the State to disclose information that would reasonably be expected to be known to prosecutors, and that is relevant to the pretrial identification of the defendant.

Independent of Green's testimony, Carter's pretrial identification of Copeland was known to the prosecutor and relevant to the pretrial identification of Green. The State's theory of the case was that only Green, Copeland, and Myers were at the scene of the shooting. At trial, the State introduced evidence aimed at establishing that Green was the third person at the scene of the shooting—*i.e.*, that Green was the shooter. Watson, Myer's girlfriend, and both of Myers's parents testified that, two days before the shooting, Green and Copeland confronted Myers about the burglary of Copeland's residence. Carter, Wisniewski, Miller, and Deputy First Class Griffin testified that, around the time of the shooting, two people were in or near a dark Mustang that was at or near the scene of the shooting. Detective Swonger prepared Cellular Analysis Reports that showed that, around the time of the shooting, Copeland's and Green's cell phones connected to cell towers in the general vicinity of Myers's residence. Peacock, Green's girlfriend, testified that, on the day of the shooting, Green told her: "Something bad might happen." Significantly, according to Peacock, later that day, Green told her that he had been present at the scene of the shooting, but that he did not do it. During the State's opening statement, the prosecutor asserted that the short, stocky person who shot Myers loosely identified as Green. During the State's closing argument, the prosecutor contended: "The shooter was the short[,] stocky guy[,] and had a bushy beard. [] Green was and is the shorter[,] stockier guy[,] and had, by his own admission[,] and[,] again[,] as supported by the evidence we presented, a bushy beard when [] Myers was shot."

In sum, the State presented evidence that Green, Copeland, and Myers were the only people at the scene of the shooting. Before Green testified, Carter's identification of

Copeland as the person who was not the shooter, in the context of the State's theory of the case and the evidence presented at trial in support of that theory, identified Green as the shooter. The State obviously knew in advance of trial that Carter's identification of Copeland as the person who was not the shooter was not only relevant, but also highly probative as to the issue of the shooter's identity.

Our holding does not require prosecutors to predict the future. As a prosecutor prepares for trial, he or she becomes aware of evidence that identifies the defendant. A prosecutor is in a position to determine whether a witness's pretrial identification of a co-defendant is the equivalent of a pretrial identification of the defendant as the person responsible for the crime. For example, here, the prosecutor was certainly aware in advance of trial of the State's theory that Green, Copeland, and Myers were the only people at the scene of the shooting and that Copeland was not the shooter. The prosecutor knew in advance that, if Carter identified Copeland as the person who was not the shooter, her identification of Copeland would essentially identify Green as the shooter. It was incumbent upon the prosecutor under Maryland Rule 4-263(d)(7)(B) to disclose Carter's pretrial identification of Copeland, as Carter's pretrial identification of Copeland was relevant information as to the pretrial identification of Green as the shooter.

Having established that the State violated Maryland Rule 4-263(d)(7)(B) by failing to disclose Carter's pretrial identification of Copeland, we must next inquire as to whether the error was harmless. Under the doctrine of harmless error, "[a]n appellate court does not reverse a conviction based on a trial court's error or abuse of discretion where the appellate court is satisfied beyond a reasonable doubt that the trial court's error or abuse of

discretion did not 'influence the verdict' to the defendant's detriment." Hall v. State, 437 Md. 534, 540-41, 87 A.3d 1287, 1291 (2014) (quoting Perez v. State, 420 Md. 57, 66, 21 A.3d 1048, 1054 (2011)) (brackets omitted); see also Dorsey v. State, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

Here, Carter's identification of Copeland as the person who was not the shooter was critical to the State's case. Carter was the State's only eyewitness to the shooting. Carter's testimony that Copeland was not the shooter was the only evidence that directly identified Green as the shooter. The other State's witnesses, at best, gave testimony demonstrating that Green and Copeland confronted Myers and testimony that placed Green at the scene of the shooting. For example, Watson and both of Myers's parents testified that, two days before the shooting, Green and Copeland visited Myers's residence and confronted him about the burglary of Copeland's residence. Detective Swonger's Cellular Analysis Reports established that, around the time of the shooting, Copeland's and Green's cell phones connected to cell towers in the general vicinity of Myers's residence. Peacock testified that, on the day of the shooting, Green said that he had been at the scene of the shooting, but denied that he had done it. Although the State produced evidence placing Green at the scene of the shooting and demonstrating that Green and Copeland had confronted Myers, Carter was the only eyewitness to the shooting. Significantly, the prosecutor referred to Carter's identification of Copeland as the person who was not the shooter at least once during the State's opening statement, and multiple times during the State's closing argument. During the State's closing argument, the prosecutor referred to Carter's identification of Copeland as a "key piece of evidence."

Undeniably, the State's failure to disclose Carter's pretrial identification of Copeland prejudiced Green. Green's counsel stated that it was a "surprise" to learn at trial that Carter was expected to identify Copeland. The State's failure to disclose Carter's pretrial identification of Copeland prevented Green's counsel from attempting to interview Carter about her identification of Copeland, and potentially performing research to determine if, or when, Carter had seen Copeland's photograph in a newspaper. Green's counsel lacked the ability to prepare to cross-examine Carter regarding the timing or remoteness of her pretrial identification of Copeland. Green's counsel was unable to prepare to question Carter as to whether anything in the newspaper article or other circumstances may have influenced Carter's testimony. Although Green's counsel theoretically could have formulated such questions without being told of Carter's pretrial identification of Copeland before trial, being aware of the pretrial identification would undoubtedly have aided Green's counsel's trial preparation.

In addition to providing Green's counsel the opportunity to interview Carter about her identification of Copeland and perform pretrial research, disclosure of Carter's pretrial identification of Copeland may have "influenced [Green's] decision to accept a plea bargain[.]" Simons, 159 Md. App. at 574, 860 A.2d at 423. In any event, "[i]t is not for us to determine what, if any, response the defense could have prepared had it known of the prior inconsistent statement. It is enough to find that the defense was denied an adequate opportunity to do so, to its prejudice." Collins, 373 Md. at 148, 816 A.2d at 929.

In sum, we are far from convinced beyond a reasonable doubt that the State's violation of Maryland Rule 4-263(d)(7)(B) did not influence the verdict to Green's

detriment. A failure to disclose a witness's pretrial identification is prejudicial, and thus not harmless error, where the witness's identification is critical to the State's case. For example, in Williams, 364 Md. at 179, 771 A.2d at 1093, this Court held that a failure to disclose a witness's pretrial identification was not harmless error where an accomplice was the only other witness to place the defendant at the scene of the crime. Similarly, in Simons, 159 Md. App. at 578, 860 A.2d at 425, the Court of Special Appeals held that a violation of Maryland Rule 4-263(d)(7)(B) was not harmless error where the witness in question was the only person who saw the defendant at the scene of the crime around the time the crime occurred.

We reject the State's contention that cross-examination was the proper remedy for the violation of Maryland Rule 4-263(d)(7)(B) in this case. As discussed above, the inability to engage in pretrial preparation hindered Green's counsel's ability to adequately prepare a defense and cross-examine Carter about her pretrial identification of Copeland. And, again, it need not be certain that Green's counsel would have actually prepared differently had he known in advance of Carter's pretrial identification of Copeland. All that is required to find that the violation was not harmless error is the circumstance that Green's counsel was denied the opportunity to prepare differently. See Collins, 373 Md. at 148, 816 A.2d at 929.

Contrary to the State's position, the prejudice to Green was not ameliorated by the circumstance that he testified that he, Copeland, and Myers were the only people at the scene of the shooting. Regardless of whether Green testified as such, Carter's identification of Copeland as the person who was not the shooter remained the only direct evidence that

- 75 -

Green was the shooter.  Independent of Green's testimony, Carter's identification of Copeland was crucial to the State's case.

Nor do we agree with the State's contention that any prejudice to Green from Carter's identification of Copeland was nullified by the circumstance that, according to the statement of charges, Carter indicated that the shooter was a short, stocky person and the non-shooter was the tall, thin person.  Green apparently was, at the time, short and stocky.  These circumstances may have given rise to the inference that Green was the shooter.  By contrast, Carter's identification of Copeland as the person who was not the shooter directly implicated Green as the shooter.  None of the State's other evidence did so.  Thus, we conclude that the error in this case was not harmless.

Having held that the State violated Maryland Rule 4-263(d)(7)(B), and that the error was not harmless, our final task is to determine the appropriate remedy.  In his briefs, Green did not specify the remedy sought, beyond requesting that we reverse the judgment of the Court of Special Appeals.  At oral argument, however, Green clarified that he simply desires a new trial, and that he does not request that we exclude Carter's identification of Copeland from the new trial.  Consistently, in Williams, 364 Md. at 181, 771 A.2d at 1094, and Collins, 373 Md. at 149, 816 A.2d at 930, after finding violations of Maryland Rule 4-263(d)(7)(B), this Court ordered new trials without instructing that the identification testimony in question be excluded from the new trials.  We shall do likewise here, and

order a new trial and refrain from ordering that Carter's identification of Copeland be

excluded on remand.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR CECIL COUNTY AND REMAND FOR A NEW TRIAL. RESPONDENT TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**

Circuit Court for Cecil County
Case No. 07-K-13-001914

Argued: September 7, 2017

IN THE COURT OF APPEALS

OF MARYLAND

No. 4

September Term, 2017

_____

JOHN W. GREEN, III

v.

STATE OF MARYLAND

_____

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Hotten
Getty,

JJ.

_____

Dissenting Opinion by McDonald, J.,
which Barbera, C.J., and Hotten, J.,  join.

_____

Filed: October 20, 2017

There is much in the meticulously rendered Majority opinion with which I agree. However, the Majority opinion interprets the discovery rule relating to a "pretrial identification of the defendant" in a way that is at odds with the language of the rule and that broadens its application well beyond an actual identification of the defendant. Accordingly, I cannot join the opinion and would affirm the well-reasoned opinion of the Court of Special Appeals on this issue. 231 Md. App. 53, 58-74 (2016).

As the Majority opinion indicates, Doris Carter was originally able to say that the confrontation on Principio Road involved a short, stocky (or stout) man and a tall, thin man and that the short, stocky man was the shooter. Despite her initial inability to make any identifications of either man, she later realized, and advised the prosecution at some point in advance of taking the stand, that she could identify Mr. Copeland as the tall, thin man. The Majority opinion characterizes this as a "pretrial identification" of Mr. Copeland, which seems fair. Majority slip op. at 62-67.

I also agree that it is appropriate to refer to Mr. Copeland, as the Majority opinion does, as a "co-defendant" of Mr. Green, regardless of whether they were both charged in the same indictment or in separate indictments. Majority slip op. at 37-41.

I also agree with the Majority opinion that the criminal discovery rule, Maryland Rule 4-263, does not require that the State make advance disclosure of a pretrial identification of a co-defendant, such as Mr. Copeland. Majority slip op. at 41-52.

The Majority opinion then reasons, however, that Ms. Carter's pretrial identification of Mr. Copeland was also "relevant … information regarding … pretrial identification of

[Mr. Green]" for purposes of Rule 4-263. Majority slip op. at 3, 67-68. This is where, in my view, the Majority opinion's reasoning departs from the rule.

In order for there to be "relevant … information regarding … pretrial identification of [Mr. Green]," there must be a pretrial identification of Mr. Green. What "pretrial identification of [Mr. Green]" is at issue here?

There is no dispute that Ms. Carter did not place Mr. Green at the scene of the crime. So the Majority opinion cannot be referring to a pretrial identification of Mr. Green by Ms. Carter. Nor was there a pretrial identification of Mr. Green by another prosecution witness. As the Majority opinion recounts, two other witnesses observed parts of the confrontation on Principio Road, but neither of those witnesses identified either Mr. Green or Mr. Copeland.[1]

Thus, there was no "pretrial of identification of [Mr. Green]" in this case. At trial, it was all the items of evidence, recounted in detail by the Majority opinion, that effectively proved that Mr. Green was the short, stocky man involved in the confrontation with Mr. Myers on Principio Road – a fact that Mr. Green confirmed in his own testimony. Ms. Carter's identification of *Mr. Copeland* as the tall, thin man in that confrontation is one

---

[1] Indeed, only Mr. Green himself in his own testimony definitively placed himself at the scene of the shooting. As the Court of Special Appeals noted, the pretrial discovery obligations of the prosecution under Rule 4-263 cannot be contingent on what testimony the defendant later gives at trial – which is likely to be unknown to the prosecution in advance of the trial. *See* 231 Md. App. at 73-74.

piece of the mosaic of relevant evidence that pointed to Mr. Green as the shooter.[2]  But this piece of the mosaic was not a "pretrial identification of [Mr. Green]."  And, without a pretrial of identification of Mr. Green, there cannot be, in the language of the rule, "relevant information" concerning a non-existent pretrial identification of Mr. Green.

The Majority opinion seeks to base its analysis on *Williams v. State,* 364 Md. 160 (2001) and *Collins v. State,* 373 Md. 130 (2003).  Both of those cases involved deficiencies in pretrial discovery concerning witnesses who were able to identify the *defendant* prior to trial and who made an identification of the *defendant* at trial.  In *Williams,* the prosecution, in response to specific requests by the defense, inaccurately stated in pretrial discovery that the witness — a police officer who had conducted a surveillance — would not be able to identify the defendant.  In *Collins,* the prosecution failed to timely disclose that a witness who made pretrial and in-court identifications of the defendant had initially been unable to make that identification.  Neither case concerned discovery of an identification of a *co-defendant,* or other evidence that might inculpate the defendant but was not itself an identification of the defendant.

Ultimately, the Majority opinion rests its holding on the proposition that, in this case, "a pretrial identification of a co-defendant [is] effectively the equivalent of a pretrial identification of the defendant."  Majority slip op. at 69.  The Majority opinion reasons

---

[2] It may well be that it would be fairer for the prosecution to disclose that piece of evidence sooner rather than later, as the prosecution was required to do with many other pieces of that mosaic (although not all inculpatory testimony is necessarily going to be revealed in pretrial discovery).  Perhaps the discovery rule should be amended to encompass pretrial identifications of co-defendants.  But that is not the question before us.

that, because Ms. Carter had described the shooter as short and stocky and the non-shooter as tall and thin, her identification of Mr. Copeland as the tall, thin man was effectively an identification of Mr. Green as the shooter. But the same could be said for Detective Lewis' testimony that, at the time of the offense, Mr. Green was 5'7" and 190 pounds while Mr. Copeland was 5'11" and 160 pounds. That testimony also established that, in relation to each other, Mr. Copeland was the tall, thin man and Mr. Green the short, stocky man, and thus "effectively" identified Mr. Green as the shooter.

In any event, it is easy for us to say, with the record of the entire trial before us (including Mr. Green's own testimony), that Ms. Carter's identification of Mr. Copeland or Detective Lewis' testimony concerning the height and weight of the two men – or some other item of evidence pointing to Mr. Green as the shooter that was known to the prosecution in advance of trial – was "effectively" an identification of Mr. Green. It is quite another thing to create a rule of pretrial discovery based on that hindsight observation. What other sort of inculpatory evidence, viewed from that perspective, will be deemed to be "effectively the equivalent" of a pretrial identification of a defendant?

In my view, the Majority opinion's interpretation of the rule undermines the notion, frequently expressed by this Court, that the rule is a "precise rubric,"[3] and renders the rule's application uncertain for those who must apply it without the benefit of hindsight.[4]

---

[3] *E.g., Williams*, 364 Md. at 171.

[4] It is also notable that issue before us – Ms. Carter's pretrial identification of Mr. Copeland – is a matter of pretrial discovery, not the admissibility of that evidence. Ms. Carter's in-court identification of Mr. Copeland was clearly admissible. Mr. Green's

Chief Judge Barbera and Judge Hotten have advised that they join this opinion.

---

counsel was free to cross-examine her about that identification in light of her failure to make any identifications in her initial interview with detectives – and did so. *See* Majority slip op. at 8-11. (As the trial judge was careful to confirm during the trial, Mr. Green's counsel had received the report of that interview in discovery). Ms. Carter's identification of Mr. Copeland no doubt bolstered the prosecution case, but it was perfectly admissible evidence and, even if the timing of its disclosure somehow violated the discovery rule – which, for the reasons explained in the text, it did not – Mr. Green is hard pressed to show how he was harmed by it.